[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14325
_____

D.C. Docket No. 1:13-cv-01434-AT

SCOTT WINFIELD DAVIS,

Petitioner-Appellant,

versus

ERIC SELLERS, WARDEN,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(October 10, 2019)

Before MARCUS and HULL, Circuit Judges, and WRIGHT,* District Judge.

WRIGHT, District Judge:

_____

* Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas, sitting by designation.

Scott Winfield Davis ("Davis"), a Georgia prisoner serving a life sentence for malice murder, appeals the district court's denial of his petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254.  The district court granted a certificate of appealability on two issues:  (1) whether Davis's due process claims are procedurally defaulted and, if not, whether the claims fail on the merits; and (2) whether the district court abused its discretion in denying Davis's request to employ the stay and abeyance procedure set forth in *Rhines v. Weber*,  544 U.S. 269, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005).  After careful review and oral argument, we affirm.

## I.  BACKGROUND

We begin by reviewing the evidence presented at Davis's criminal trial and procedural history.

### A.  Murder, Arson, Alibi, and Initial Arrest

On Friday, December 6, 1996, a private detective gave Davis the home address of David Coffin, Jr., who was dating Davis's estranged wife, Megan. After two years of marriage, Megan had filed for divorce and left the couple's Atlanta home.  Davis, who desperately  hoped for a reconciliation, hired the detective to follow Megan, and  told an acquaintance that he would kill anyone who had a sexual relationship with his wife.  With the address in hand,  Davis told the detective that he planned to drive by Coffin's house that weekend.

2

On Saturday, December 7, 1996, while Coffin was spending the night at Megan's apartment, his home was burglarized and vandalized, and a phone call was placed from his home phone to Davis's. Later that night, Davis left multiple, emotional messages on Megan's phone, begging her to answer and asking if she were sleeping with Coffin. Coffin returned to his house the next morning and discovered his television set destroyed and entertainment room in disarray. Missing from the residence were Coffin's Porsche automobile, Beretta handgun, two shotguns, caller identification box, and two watches.

On Monday, December 9, 1996, Davis called in sick to work. That evening, Davis exchanged vehicles with his neighbor, Greg Gatley, telling Gatley that he needed his Jeep Cherokee, which was white, to return a table and chairs borrowed for a Christmas party. Coffin also owned and drove, in addition to the Porsche, a white Jeep Cherokee. After Gatley and Davis exchanged cars, Gatley drove Davis's car to a nearby gym called Australian Body Works, and the next time he saw Davis was later that night, when Davis returned the Jeep.

On Tuesday, December 10, 1996, a morning 911 call took Dekalb County Fire Department personnel to a road near Coffin's home, where Coffin's stolen Porsche sat unoccupied and on fire. That evening, Coffin's neighbor observed flames coming from Coffin's house and called 911. Firefighters later discovered Coffin's charred body in what remained of his incinerated home.

The same evening, Davis made several calls to the police. Before the discovery of the house fire and Coffin's body, Davis reported that an intruder had entered his home and sprayed him with mace. Davis told the responding officer that his attacker put a gun to his head and warned him to "leave Megan alone" and that after a failed attempt to steal his car, the attacker fled on foot and jumped over his backyard fence. Davis called police a second time to report that a gas can, tools, and clothing were missing from his home after the alleged attack, and made a third emergency call a few hours after firefighters were dispatched to the fire at Coffin's house. With his last call, Davis reported that he had awakened to find flames on his back patio and a person in a ski mask with a handgun. Davis told the responding officers that he had fired a shotgun at the masked person, who had shot back and fled over the back fence, and that Davis had extinguished the fire with a garden hose.

After firefighters discovered Coffin's body, homicide detectives Rick Chambers and Marchal Walker went to the scene and learned about Davis's emergency calls and his connection to Megan and Coffin. The detectives went to Davis's residence, a short distance away, where Davis repeated the information he had reported earlier. Given similarities between the events at Davis's house and Coffin's, and the assailant's reference to Megan, the detectives requested that

4

Davis provide a written statement, and he agreed.  Davis voluntarily allowed officers at the scene to transport him to the homicide office to give his statement.

At the homicide office, Davis dictated a statement to Chambers, and Chambers asked him some questions.  At first, Chambers viewed Davis as a victim, but as his story progressed, he became suspicious and provided Davis *Miranda* warnings.  Davis waived his *Miranda* rights and continuing with the interview, said that he had learned that Coffin's house was on fire and that Coffin had been shot.  At that time, law enforcement had no information about the cause of death, as Coffin's body had been severely burned.  Only later would an autopsy reveal that Coffin died from a gunshot wound to the head.  When asked how he had learned that Coffin had been shot, Davis said that he thought that Megan or her friend, Craig Foster, had told him during a phone conversation.  Chambers left the interview room and called Megan and Foster, who both denied that they knew how Coffin died or that they had told Davis that Coffin had been shot.  Chambers, assisted by Walker, continued the remainder of Davis's interview on audiotape. Davis was free to go when the interview concluded, and Chambers and Walker drove him home.  Before Chambers left Davis's residence, he scanned the back fence for evidence of a fleeing intruder but found nothing.

On Thursday, December 12, 1996, Davis told Gatley that they needed to "get their stories straight," and asked Gatley to tell police that he had seen him at

5

the Australian Body Works Gym on December 9, the night the two had exchanged vehicles.  Gatley told Davis that he was just going to tell the truth.

On Friday, December 13, 1996, officers arrested Davis on charges of Coffin's murder, the burglary and arson of Coffin's home, and the theft of Coffin's Porsche.  Davis was eventually released, and the Fulton County District Attorney dismissed the charges in mid-1998, but Davis remained a suspect.

## B.  Indictment and Pretrial Motion to Dismiss Based on Lost and Destroyed Evidence

In November 2005, a Fulton County grand jury charged Davis with felony and malice murder, alleging that between December 9 and 10, 1996, he shot Coffin and set his body on fire.   Davis urged the trial court that the State's loss or destruction of evidence during the nine-year period between his initial arrest and eventual indictment violated his right to due process.  Before trial, he filed a motion to dismiss the indictment based on the loss or destruction of evidence and reported that the State's attorney had notified defense counsel that much of the physical evidence in the case had been lost or destroyed.  In his written motion, Davis alleged that the State lost or destroyed the following evidence:

- a Beretta handgun (the alleged murder weapon) recovered from the murder scene, near Coffin's body
- a bullet and a bullet casing removed from Coffin's body
- a hat tassel found in the Jeep Cherokee that Davis borrowed from Gatley
- a gasoline can recovered from Coffin's torched Porsche
- remnants of a 1996 Atlanta Olympics plastic bag recovered from Coffin's torched Porsche

6

- a shotgun recovered from Coffin's torched Porsche
- a knife recovered from Coffin's torched Porsche
- a flashlight recovered from Coffin's torched Porsche
- a key recovered from Coffin's torched Porsche
- a caller identification unit recovered from Coffin's torched Porsche
- a second gasoline can found December 26, 1996 on a road close to Coffin's home

Davis argued that the foregoing items were potentially exculpatory and that law enforcement personnel had acted in bad faith by destroying or losing them.  After a hearing, the trial court denied the motion, finding that the missing evidence was material but that without a showing of bad faith on the part of the State, the loss or destruction of the evidence did not amount to a denial of due process.

### C.  Trial, Conviction, and Posttrial Motion for a New Trial Based on Lost and Destroyed Evidence

At trial, over defense counsel's continued objection, witnesses referred to multiple articles of lost or destroyed evidence.  For example, Megan identified a photograph of the gas can surrounded by a plastic bag remnant that firefighters recovered from Coffin's Porsche.  She testified that the gas can, which had the word "gasoline" printed on the diagonal, looked like one that had been present in the home she had shared with Davis.  Megan also testified that the plastic bag remnant looked like a drawstring bag with a sports insignia that Davis had brought home after the 1996 Atlanta Olympics, but she acknowledged that she did not know whether the gas can and bag were the same items that she had observed in

7

her marital home.  Also notable was testimony that the Beretta handgun that Coffin owned and had reported stolen was discovered under his  head.

Several witnesses testified about forensic tests attempted or performed before physical evidence was lost or destroyed.  A Georgia Bureau of Investigation ("GBI") firearms examiner testified that the bullet removed from Coffin and Beretta and shell casings from the crime scene were untestable due to fire and water damage.  Although the examiner could not verify that the bullet had been fired from the Beretta, she said that the projectile's features were consistent with being fired from that type of gun.

A retired GBI fingerprint examiner, qualified as a latent fingerprint expert, testified that extreme heat from fire and water damage would have destroyed any fingerprints on the Beretta, magazine, bullets and casings.  He recalled that he had received fingerprint cards containing latent prints from the exterior of the Porsche and that he had concluded, after an analysis, that these prints did not match those taken from Davis and Megan.  Testimony established that the fingerprint cards were missing, without explanation.  The fingerprint expert acknowledged that he did not submit the prints to the GBI's Automated Fingerprint Identification System ("AFIS"), which compares digitized prints against a national database containing prints of millions of convicted criminals.  He also confirmed that if the fingerprint cards were still available, they could be matched against other prints individually,

8

and if the cards held prints of sufficient quality, they could be digitized and submitted to the AFIS.

The evidence established that six law enforcement agencies participated in the underlying arson and murder investigations:  The Atlanta Police and Fire Departments;  the DeKalb County Police and Fire Departments; the GBI; and the Fulton County District Attorney's Office.  Testimony confirmed that various items of missing evidence had been transferred between agencies without regard to standard operating procedures.  Chambers testified that the Beretta, bullet, and casings had been shipped from the GBI to the Atlanta Fire Department without proper documentation, and the items were missing without explanation.  Chambers recalled that in 1996, he asked the DeKalb police and fire departments to preserve evidence recovered from the Porsche, but in 2005, he learned that the items had been destroyed.  Chambers testified that when he learned that evidence was missing in 2005, he searched agency property rooms but failed to recover the missing evidence.

On December 4, 2006, a jury found Davis guilty of malice murder, and the trial court imposed a life sentence.[1]   Davis moved for a new trial, arguing that the court erred in admitting evidence related to lost or destroyed evidence.  Davis cited

---

[1]In addition to malice murder, the jury found Davis guilty on two counts of felony murder that were vacated by operation of law.  *Davis v. State*, 285 Ga. 343, (citing *Malcom v. State*, 263 Ga. 369, 372(4), 434 S.E.2d 479 (1993)).

an expanded list of lost or destroyed evidence, including the lost fingerprint cards that held latent prints lifted from the exterior of the burned Porsche, and testimony at a post-trial hearing revealed that the State still had possession of the cards shortly before Davis's 2005 indictment. The trial court denied Davis's post-trial motion, finding that the lost evidence was only potentially useful and that there was no bad faith on the part of the State.

## D.  Direct Appeal

Among Davis's claims on direct appeal, he argued that that the trial court committed reversible error in denying his motion to dismiss the indictment based on the State's loss or destruction of evidence. The Georgia Supreme Court affirmed the trial court's judgment, *Davis v. State*, 385 Ga. 343, 676 S.E.2d 215 (2009), and the United States Supreme Court denied certiorari. *Davis v. Georgia*, 558 U.S. 879, 130 S. Ct. 287, 175 L. Ed. 2d 135 (2009).

## E.  State Habeas Proceedings

Davis filed a state habeas petition, asserting twelve ineffective assistance of counsel claims. The petition also included two stand-alone due process claims: that the State's firearms expert provided false testimony and that trial court erred in admitting the testimony of a private investigator.

Among Davis's ineffective assistance claims, he faulted his attorneys for failing to obtain  an expert witness to show that the tape of his police interview,

which was admitted at trial, had been altered and that there was a second recording device in operation during the interview and a second tape. Davis alleged that "the tape was stopped once and that he was threatened off the tape with the death penalty, among other things."[2] He charged that counsel's failure to investigate the technical integrity of the interview tape resulted in an unfair trial, where "Detective Chambers perjured himself . . . when he testified that the tape was continuous."[3] Davis argued that if counsel had hired an expert to show that the tape had been altered, he could have impeached Chambers and created a complete lack of confidence in the trial.[4]

The state habeas court held an evidentiary hearing, and Davis's attorney called Walker as a witness to authenticate a transcript of Davis's police interview. Walker testified that the transcript contained the entirety of the interview, the court admitted the transcript, and Walker was not questioned further. Chambers also testified and recalled that Davis's interview was taped using a "basic" cassette recorder, which, to his knowledge, was stopped once by Walker to turn the tape over. Chambers stated that he was unaware of any other stops, but he said that it was possible that the recording was stopped for another reason, such as getting Davis some water. Chambers denied that Davis was threatened with the death

---

[2]ECF No. 1-3, at 9
[3]ECF No. 1-3, at 12 (Davis's state habeas petition, Ground 12).
[4]*Id.*

11

penalty, that the tape had been altered, or that there was a second tape recorder in use during the interview.  When asked whether the tape contained previous recordings, Chambers responded, "It was Detective Walker's tape, and I believe he had another interview on there we taped over."[5]

Davis's state habeas counsel retained a tape expert named James Griffin, who analyzed the audiotape played for the jury at Davis's criminal trial.  In testimony before the state habeas court, Griffin opined that the tape was neither authentic nor continuous.  Specifically, he testified that the recording contained voice-activated pauses, which would occur automatically when the tape recorder detected that surrounding sound fell below a certain volume; that Davis's interview was taped over previous recordings; and that the tape was manually stopped two times during the interview, once on each side, not including a stop when the tape ran out at the end of the first side.  Griffin stated that prior to one manual stop, Davis was asked whether he wanted water, and after the recording resumed, a someone said, "turn the tape over," followed by a fumbling or rummaging sound. Griffin opined that the directive, "turn the tape over," and fumbling noises indicated the presence of a second tape recorder.

In a written order denying habeas relief, the state court made findings of fact and conclusions of law related to Davis's allegations about audiotape tampering

---

[5]ECF No. 1-20, at 70.

and the existence of a second recording *only* in connection to his ineffective assistance of counsel claim.  The state court denied the claim, finding that Davis failed to show either deficient performance or prejudice as required under *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). On March 18, 2013, the Georgia Supreme Court denied Davis's application for a certificate of probable cause to appeal the denial of habeas corpus relief.

### F.  Federal Habeas Proceedings

Next, Davis filed a petition in the United States District Court for the Northern District of Georgia seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Davis pleaded eleven grounds for relief, each framed as a challenge to factual and legal findings by the state habeas court.[6]  Relevant to this appeal, Davis's petition challenged nonexistent determinations by the state court regarding purported independent due process claims related to missing or destroyed evidence.

---

[6]Respondent reports incorrectly that Davis's § 2254 petition raised the same claims asserted in his state habeas petition and that he filed an attachment that seemed to challenge various factual and legal determinations by the state habeas court.  Paragraph 12(a)(4) of Davis's § 2254 petition form required that he list all grounds raised in post-conviction petitions filed in state court, and Davis merely complied with that instruction.  *See* ECF 1, at 2, 10-11.  Additionally, Davis's attachment challenging the state habeas court's determinations refers to paragraph 14 of the petition form, which is reserved for the petitioner's grounds for habeas relief under § 2254.

13

Focusing exclusively on the state habeas proceedings, the district court found that any claims based on the loss or destruction of evidence, untethered from ineffective assistance of counsel claims, were procedurally defaulted. The district court found that Davis's state habeas petition included only two independent due process claims that centered on testimony from the State's firearms expert and Davis's private investigator, not the state's loss or destruction of evidence.

On the other hand, the district court noted that the state habeas record contained "frequent conflation" of Davis's ineffective assistance of counsel claims and what were, conceivably, independent due process arguments. Accordingly, the district court also addressed the merits of an independent due process claim based on lost or destroyed evidence. While observing that "the state's handling of the evidence in this case is certainly troubling," the district court ultimately determined that the lost evidence was not apparently exculpatory, and even if viewed as potentially useful, Davis failed to demonstrate bad faith.

The district court entered judgment denying Davis's § 2254 petition, and commenting that the pervasive loss of evidence in Davis's case caused it "to pause repeatedly," the district court granted a certificate of appealability as to whether Davis's independent due process claims were procedurally defaulted, and, if not, whether the claims fail on the merits.

## G.  Notices of New Evidence, Motion for Reconsideration, Expansion of the Certificate of Appealability

14

In denying habeas relief, the district court addressed "notices of new evidence" that Davis filed after submission of the magistrate's final report and recommendation. Davis reported that his attorney had received a taped conversation between then-retired detective Marchal Walker and criminal justice student/amateur sleuth Jennifer Bland ("Bland"). Davis said that Walker admitted to Bland that there were two audiotapes of his police interview and that Walker provided both tapes, along with transcripts, to an assistant district attorney named Joe Burford. Davis argued: "This establishes not only that . . . Chambers was untruthful when he repeatedly testified that there was one tape, but that the prosecutors knew that this was a lie but still allowed Chambers to testify that there was only one tape in violation of their obligations under [*Brady v. Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963) and *Giglio v. United States,* 405 U.S. 150, 92 S. Ct. 763, 31 L.Ed.2d 104 (1972)]."[7]

Davis requested that the district court either grant an evidentiary hearing or "remand" the case to state court based on newly discovered information. Without addressing the merits of Davis's request for "remand," the district court denied his request for a hearing, finding that he failed to meet the standard imposed under 28

---

[7]ECF No. 65, at 4.

15

U.S.C. § 2254(e)(2)(B).[8]   Following the entry of judgment denying habeas relief,

Davis moved for reconsideration, requesting that the district court either "remand"

the case back to the state court for a consideration of new evidence of a second

tape or amend the certificate of appealability to include the question of whether

Davis is entitled to "a stay and remand."  The district court granted Davis's motion

to the extent that it amended the certificate of appealability, finding that

"reasonable jurists could disagree whether or not the Court should stay the case

and remand it the state court to examine the 'second tape' issue".[9]

## II.  STANDARD OF REVIEW

When reviewing a district court's denial of a habeas petition, we review

questions of law and mixed questions of law and fact *de novo,* and findings of fact

for clear error.  *Grossman v. McDonough*, 466 F.3d 1325, 1335 (11th Cir.

2006)(citing *Maharaj v. Sec'y for Dep't of Corr.,* 432 F.3d 1292, 1308 (11th

Cir.2005), *cert. denied,* 549 U.S. 819, 127 S. Ct. 348, 166 L.Ed.2d 33 (2006)).  The

question of whether federal habeas claims have been exhausted presents a mixed

question of law and fact to be reviewed *de novo.*  *Kelley v. Sec'y for Dep't of Corr.*,

---

[8]Having listened to recordings of the Bland/Walker conversations, the district court observed that Bland assumed the existence of a second tape and posed leading questions.  The district court also noted the lack of any information regarding the content of a second tape or reasons why Davis failed to question Walker about a second tape during the state habeas hearing.
[9]ECF 89, at 2.

16

377 F.3d 1317, 1345 (11th Cir. 2004)(citing *Lusk v. Singletary*, 112 F.3d 1103, 1105 (11th Cir. 1997)).

When reviewing a claim adjudicated on the merits in state court, our review under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), is limited. We may grant a writ of habeas corpus on such a claim only where the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law if the state court either "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or  "decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523 (2000).  A state court decision is an "unreasonable application" of Supreme Court precedent if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the [petitioner's]  case."  *Id*.  A federal habeas court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal

17

law erroneously or incorrectly.  Rather, that application must also be

unreasonable." *Id*. at 411, 120 S. Ct. at 1522.  "Pursuant to AEDPA, we may only

grant relief where the state court's ruling contained an error so clear that fair-

minded people could not disagree about it."  *Krawczuk v. Sec'y, Fla. Dep't of

Corr.*, 873 F.3d 1273, 1293 (11th Cir. 2017)(citing *Wright v. Sec'y, Fla. Dep't of

Corr.*, 761 F.3d 1256, 1277 (11th Cir. 2014)).

## III.  DUE PROCESS CLAIMS BASED ON LOST OR DESTROYED EVIDENCE

### A.  Exhaustion

Regardless of whether Davis presented an independent due process claims

based on lost or destroyed evidence in the state habeas proceedings, we find that he

clearly exhausted the claims with his motion to dismiss the indictment and motion

for a new trial and related claim on direct appeal.  As Respondent now

acknowledges, Davis's due process claims based on missing evidence "may now

be raised using somewhat different language and arguments, [but] they are still the

same due process claims that trial and appellate counsel thoroughly addressed and

litigated at the trial court level and on direct appeal."[10]  Davis was not required, for

---

[10]Resp.'s Br. at 14-15.  Respondent's concession extends only as far as the specific items listed in Davis's pre-trial motion to dismiss the indictment:  a Beretta handgun, a bullet and bullet casing, a hat tassel, two gas cans, a plastic bag, a shotgun, a knife, a flashlight, and a telephone caller ID unit.  *See* Resp.'s Br. at 14.  Respondent argues that we should defer to the Georgia Supreme Court's finding that Davis waived any challenge to the fingerprint card and other evidence not specifically listed in his written motion to dismiss the indictment.

18

exhaustion purposes, to raise the same claims for duplicate review in a state habeas petition. *Mauk v. Lanier*, 484 F.3d 1352, 1357 (11th Cir. 2007)(citing *Castille v. Peoples,* 489 U.S. 346, 349, 109 S. Ct. 1056, 1059 (1989)("The Supreme Court has recognized, however, that a claim can be exhausted even when there exists a possibility of further state court review, so long as the claim has been 'fairly presented' to the state courts.").

Davis has, however, abandoned any additional independent due process claims, including those that he unquestionably pursued in the state habeas proceedings, as he failed to address them plainly and prominently in his appeal briefs. *See Brown v. United States*, 720 F.3d 1316, 1332 (11th Cir. 2013)(citing *United States v. Jernigan,* 341 F.3d 1273, 1283 n. 8 (11th Cir. 2003)("Merely making passing references to a claim under different topical headings is insufficient. Instead, the party must clearly and unambiguously demarcate the specific claim and devote a discrete section of his argument to it . . . so the court may properly consider it.").

**B.  The Decision of the Georgia Supreme Court Passes Review Under 28 U.S.C. § 2254(d).**

Although the district court erred in finding Davis's due process claims based on lost or destroyed evidence procedurally defaulted, we affirm the denial of habeas relief because we conclude that the Georgia Supreme Court's denial of the claims on direct appeal is entitled to deference under 28 U.S.C. § 2254(d). *United*

19

*States v. Chitwood,* 676 F.3d 971, 975 (11th Cir. 2012)("[W]e may affirm for any

reason supported by the record, even if not relied upon by the district court.").

A due process claim based on lost or destroyed evidence comes under

"'what might loosely be called the area of constitutionally guaranteed access to

evidence.'" *Arizona v. Youngblood,* 488 U.S. 51, 55, 109 S. Ct. 333, 102 L.Ed.2d

281 1988)(quotation omitted). In *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194,

10 L. Ed.2d 215 (1963), the Supreme Court held that the Due Process Clause of the

Fourteenth Amendment commands the State to disclose favorable evidence in its

possession or control that is material to guilt of a criminal defendant. When the

State suppresses or fails to disclose material exculpatory evidence, a due process

violation results, and the question of bad faith is irrelevant. *Illinois v. Fisher,* 540

U.S. 544, 548, 124 S. Ct. 1200, 1202–1203, 157 L.Ed.2d 1060 (2004)(citing *Brady*

*v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v.*

*Agurs,* 427 U.S. 97, 96 S. Ct. 2392, 49 L.Ed.2d 342 (1976)). Relevant here, the

State's duty to preserve evidence is limited to "evidence that might be expected to

play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S.

479, 488, 104 S. Ct. 2528, 2534, 81 L. Ed. 2d 413 (1984). "To meet this standard

of constitutional materiality, evidence must both possess an exculpatory value that

was apparent before the evidence was destroyed, and be of such a nature that the

defendant would be unable to obtain comparable evidence by other reasonably

20

available means." *Id.* at 489, 104 S. Ct. 2528 (citation omitted).   Additionally, "the failure to preserve . . . 'potentially useful evidence' does not violate due process 'unless a criminal defendant can show bad faith on the part of the police.'" *Illinois v. Fisher,* 540 U.S. 544, 547–48, 124 S. Ct. 1200, 157 L.Ed.2d 1060 (2004)(quoting *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S. Ct. 333, 102 L.Ed.2d 281 (1988)).

Our review is limited to the record that was before the Georgia Supreme Court, and it focuses on what the state court "knew and did" at the time it rendered its decision.  *Cullen v. Pinholster*, 563 U.S. 170, 182, 131 S. Ct. 1388, 1399, 179 L. Ed. 2d 557 (2011).  In his brief to the Georgia Supreme Court, Davis argued that that the trial court committed reversable error in denying his motion to dismiss based on the State's loss or destruction of evidence.[11]  He enumerated the same lost or destroyed items listed in his written motion (a Berretta handgun, a bullet and casing, a hat tassel, two gas cans, a plastic bag, a shotgun, a knife, a flashlight, a key, and a caller ID unit), and he included the expanded list of items cited in his motion for a new trial.

Davis generally argued that missing weapons, shell casings, projectiles and gas cans could have been examined for fingerprints and that tests could have shown whether the missing shell casing and projectile matched the alleged murder

---

[11]Br. of Appellant, Davis v. State, No. S09A0395, 2008 WL 5644537 (Ga. Dec.11, 2008).

21

weapon.  The bulk of Davis's argument focused on the fingerprint cards that held latent prints taken from the door of the Porsche.  Davis maintained that the prints would identify the "actual" murderer, and he argued that the State acted in bad faith by failing to utilize the AFIS.  Davis recounted testimony from the post-trial hearing on his motion for a new trial, which revealed that the fingerprint cards still existed in 2005, just prior to his indictment.

Davis also cited evidence showing that each of the six agencies involved in the underlying arson and fire investigations grossly mishandled the missing evidence in violation of standard operating procedures.  He argued:

> The care exhibited by these agencies was little more than what would be expected from school children exchanging toys at a holiday gathering. No one was keeping track of what was being transferred: for example, one chain of custody document helpfully explains that "three bags of evidence" were being transferred to the DA's office. No one can identify what was in any of the bags. The location of the bags, to say nothing of the contents of the bags, remains a mystery.

Scott Winfield DAVIS, Appellant, v. State of Georgia, Appellee., 2008 WL 5644537 (Ga.), at 113.

In denying Davis's claim, the Georgia Supreme Court identified the correct legal standard as determined by the United States Supreme Court, repeating *Trombetta's* standard for constitutional materiality and *Youngblood's* bad-faith requirement.  *See Davis v. State*, 285 Ga. at 349, 676 S.E.2d at 220(quoting *Milton v. State,* 232 Ga. App. 672, 678–679, 503 S.E.2d 566 (1998)).  Regarding the items

22

that Davis listed in his pretrial motion to dismiss, the Georgia Supreme Court

found as follows:

> In his motion to dismiss, Davis challenged the loss or destruction of a handgun, a bullet and its casing, a tassel from a hat, two gas cans, a plastic bag, a shotgun, a knife, a flashlight, a key and a telephone caller identification unit.  Other than the tassel and one of the gas cans, all . . . items were found either in the victim's burned car or home and were generally not suitable for forensic testing because they had been damaged by fire and doused with water.  Furthermore, any testing that was conducted on the items was preserved at trial by witness testimony.  In any event, Davis has failed to show that any of the items were exculpatory. Moreover, there is no evidence that the State acted in bad faith.

*Davis,* 285 Ga. at 349, 676 S.E.2d 215, 220 (2009)(citing  *Pickens v. State,* 225 Ga.

App. 792, 799, 484 S.E.2d 731 (1997)).

As for the fingerprint card and other items that were not listed in Davis's

pretrial motion to dismiss, the Georgia Supreme Court found that Davis failed to

contest loss of the items and had "waived any such challenges" on direct appeal.

Alternatively, the state court held that "even if the challenges were not waived,

they are without merit due to any showing that the State acted in bad faith."  *Davis*,

285 Ga. at 349, 676 S.E.2d at 220.

We cannot say that the Georgia Supreme Court's resolution of Davis's

claim was contrary to, or an unreasonable application of *Trombetta*, *Youngblood*,

23

or any other clearly established federal law, or that the state court's adjudication was based on an unreasonable determination of the facts.[12]

We find entirely reasonable the Georgia Supreme Court's conclusion that the Beretta, bullet and casings, hat tassel, gas cans, plastic bag, shotgun, knife, flashlight, key and telephone caller identification unit failed to meet the standard for constitutional materiality. Testimony from law enforcement and forensic examiners showed that that these items, save the hat tassel from Gatley's Jeep Cherokee and gas can found abandoned on a road, were rendered untestable by fire and water damage. Unsurprisingly, Davis failed to show that these items had an exculpatory value that was apparent before they were lost or destroyed, and he failed to show that the hat tassel or gas can had any exculpatory value. Davis now argues that access to the gas can recovered from Coffin's vehicle would have enabled him to "run serial numbers" and establish that it was dissimilar from the gas can that he had owned when married. He also contends that access to bullets and casings would have allowed him to track down where the ammunition was purchased and that never-recovered torn clothing, which he maintains was left by

---

[12]We take the facts of this case as reported by the Georgia Supreme Court and from the record. Davis has not directly challenged these facts, but to the extent that he does so indirectly in making legal arguments, we find that he has not rebutted by clear and convincing evidence the presumption of correctness that attaches to the state court's determination of facts. 28 U.S.C. § 2254(e)(1)("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

the intruder who fled his home over a fence, would have identified the person who attacked him.  Whether considered individually or collectively, these items and the missing fingerprint cards were "potentially useful" at best.

We further find that the Georgia Supreme Court's ultimate conclusion as to bad faith passes review under 28 U.S.C. § 2254(d).  *See Gill v. Mecusker*, 633 F.3d 1272, 1291 (11th Cir. 2011)(citing *Harrington v. Richter*, 562 U.S. 86, 112, 131 S. Ct. 770, 792, 178 L. Ed. 2d 624 (2011)(("[T]he 'precise question' that must be answered under the AEDPA standard must focus on [the] state court's ultimate conclusion.").  To be sure, the failure to follow standard operating procedures for the custody and preservation of evidence is relevant to the absence or presence of bad faith.  *See Youngblood*, 488 U.S. at 65, 109 S. Ct. at 341, 102 L. Ed. 2d 281(noting that in *Trombetta,* "the importance of police compliance with *usual procedures* was manifest").  However, there is no evidence that departures from protocol were coordinated or designed to deprive Davis of evidence expected to play a significant role in his defense.  As the Georgia Supreme Court observed: "Even if we were to assume that the State's 'handling of the [items] (indicated) careless, shoddy and unprofessional investigatory procedures, (it did) not indicate that the police in bad faith attempted to deny [Davis] access to evidence that they knew would be exculpatory.'" *Davis v. State*, 285 Ga. 343, 349, 676 S.E.2d 215,

25

220 (2009)(quoting *Jackson v. State,* 258 Ga. App. 806, 810(3), 575 S.E.2d 713 (2002)).

In cases involving a failure to preserve evidence, a finding of bad faith is necessarily tied to the State's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed. *Youngblood*, 488 U.S. at 58, 109 S. Ct. at 337, 102 L. Ed. 2d 281("We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant."). The Georgia Supreme Court was without evidence that officers knew or should have known that the lost or destroyed evidence was exculpatory, and as was the case in *Trombetta*, "[t]he record contain[ed] no allegation of official animus towards [Davis] or of a conscious effort to suppress exculpatory evidence," *Trombetta,* 467 U.S. at 488, 104 S. Ct. at 2533, 81 L.Ed.2d 413.

## C.  The District Court Did Not Err in Denying Davis's Request for a Stay

We next address whether the district court erred in denying Davis's request to stay and hold in abeyance this federal habeas case to allow him to pursue any

26

relief available in state court regarding a "second tape" of his 1996 police interview.[13]

In *Rhines v. Weber*, 544 U.S. 269, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005), the Supreme Court recognized that when a federal habeas petition is "mixed" because it contains both exhausted and unexhausted claims, a district court has discretion to hold the exhausted claims in abeyance while the petitioner presents the unexhausted claims in state court. The *Rhines* Court recognized that the AEDPA's one-year statute of limitation for federal habeas petitions multiplied the consequences of the complete exhaustion requirement mandated under *Rose v. Lundy,* 455 U.S. 509, 102 S. Ct. 1198, 71 L.Ed.2d 379 (1982), and presented a risk that "petitioners who come to federal court with 'mixed' petitions run the risk of forever losing their opportunity for any federal review of their unexhausted claims." *Rhines*, 544 U.S. at 275, 125 S. Ct. at 1533, 161 L. Ed. 2d 440.

In this case, the district court did not abuse its discretion in failing to utilize the stay-and-abeyance procedure because Davis had no available state court remedies to pursue. Davis's ostensible due process claims based on alteration of

---

[13]The district court amended the certificate of appealability, finding that "reasonable jurists could disagree whether or not the Court should stay the case and remand it the state court to examine the "'second tape' issue." ECF No. 89, at 2. More accurately stated, the question on appeal is whether the district court erred in failing to stay and hold in abeyance the federal habeas case, while Davis attempted to exhaust available remedies in state court. It is not within the province of federal habeas court to "remand" a claim to a state court or otherwise direct a state court in the performance of its duties.

the tape played during his criminal trial and the suppression of a second tape are procedurally defaulted because he failed to comply with Georgia's successive petition rule, which provides:

> All grounds for relief claimed by a petitioner for a writ of habeas corpus shall be raised by a petitioner in his original or amended petition.  Any grounds not so raised are waived unless the Constitution of the United States or of this state otherwise requires or unless any judge to whom the petition is assigned, on considering a subsequent petition, finds grounds for relief asserted therein which could not reasonably have been raised in the original or amended petition.

Ga. Code Ann. § 9-14-51.  Our review of the record confirms that Davis never moved to amend his state petition to include an independent due process claim based on the state's alteration of evidence or suppression of a second tape. Consequently, such claims are subject to § 19-14-51, which imposes a  procedural bar that Davis can overcome only if he raises grounds for relief that are constitutionally nonwaivable, which is not the case, or which could not reasonably have been raised in his original or an amended state petition.

The record confirms that Davis was aware of facts that provided a basis for his claims before he filed his state habeas petition, and he failed to develop or present the claims when he had the opportunity in state court.  He acknowledges that "leading up to the state habeas proceedings," his attorney had "interviewed an expert who explained that the single recording seemed to show stops and that a second recorder was operating in the room" and that his attorney knew that the

28

transcript of Davis's police interview contained a reference to "tape #2."[14]  Davis explains that he chose not to proceed with an independent due process claim during the state habeas proceedings because Chambers had testified that there was only one tape of Davis's interview,[15] and Walker claimed in an 2010 interview with a private investigator that he had no knowledge of a second recording.[16]  Davis contends that if "Walker had said what he has now repeated three times, post-conviction counsel would have clearly raised a *Brady/Giglio* claim based on the State's failure to turn over the second recording."[17]  But as Respondent notes, Walker testified before the state habeas court, and Davis's attorneys failed to ask him a single question about altered evidence or the possibility of a second tape. We find no basis to conclude that a state court judge would find that Davis's claim could not have been raised in the original or an amended state habeas petition.

Because a successive petition would be procedurally barred under Georgia law, Davis's claim is technically exhausted, and utilization of the *Rhines* stay-and-abeyance procedure would be futile and an abuse of discretion. *See Coleman v.*

---

[14]Pet'r's Br., 56.

[15]Davis fails to cite the portion of Chambers's trial testimony specifically stating that only one tape was used to record the interview.  Chambers identified a microcassette tape marked "David Coffin," as "the" tape used to record Davis's police interview.

[16]Davis's assertion that Walker claimed no knowledge of a second recording is based on the affidavit of a private investigator named Debra Mulder.  The affidavit, which Davis submitted in support of his "notice of new evidence" in district court, states that Mulder interviewed Walker in 2010, and he told her that only one tape recorder was used during Davis's 1996 police interview.  ECF No. 64-1, at 1.

[17]Pet'r's Br., 56-57.

*Thompson*, 501 U.S. 722, 732, 111 S. Ct. 2546, 2555, 115 L. Ed. 2d 640 (1991)(noting that a "habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him"); *see also Rhines,* 544 U.S. at 277, 125 S. Ct. at 1534-35, 161 L. Ed. 2d 440(noting that the stay-and-abeyance procedure, if employed too frequently, has the potential of undermining AEDPA objectives of comity, finality, and federalism).

If we were faced with a mixed petition, which is not the case, Davis still would not  meet the requisites for the stay-and-abeyance procedure.  The "limited circumstances" that permit utilization of the procedure are these:  (1) the petitioner has "good cause" for failing to exhaust claims in state court; (2) the unexhausted claims are "potentially meritorious;" and (3) "there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Rhines,* 544 U.S. at 278, 125 S. Ct. at 1535, 161 L. Ed. 2d 440.

Davis insists that he was not aware of the factual predicate for a *Brady* claim related to the second tape until after he filed his federal habeas petition.  But as we have explained, such is not the case, and Davis fails to meet the good-cause requirement.  Furthermore, while Davis alludes to a "*Brady/Giglio* claim regarding the second tape," he fails to demonstrate that this ill-defined claim is potentially meritorious.

30

Whether proceeding under *Brady* or *Giglio*, a defendant must show that the evidence in question was material.  For a *Brady* claim, "'evidence is 'material' . . . when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Smith v. Cain*, 565 U.S. 73, 75, 132 S. Ct. 627, 630, 181 L. Ed. 2d 571 (2012)(quoting *Cone v. Bell,* 556 U.S. 449, 469–470, 129 S. Ct. 1769, 173 L.Ed.2d 701 (2009)).  And to prevail with the brand of *Brady* error known as a *Giglio* violation, a petitioner must show that "the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material-*i.e*., that there is 'any reasonable likelihood' that the false testimony 'could ... have affected the judgment.'" *Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir. 2006)(quoting *Giglio,* 405 U.S. at 154, 92 S. Ct. 763)).  In either case, the question of materiality must be evaluated in the context of the entire record.  *See United States v. Agurs*, 427 U.S. 97, 112, 96 S. Ct. 2392, 2402, 49 L. Ed. 2d 342 (1976).

Notwithstanding evidence that Davis had threatened to kill anyone who slept with Megan, that he had hired someone to follow Megan and to obtain Coffin's address, and that he had gone to extreme measures to establish an alibi, Davis contends that the only evidence linking him  Coffin's murder was his statement to Chambers that Coffin had been shot.   Davis suggests that he uttered the statement only because Chambers threatened him with the death penalty "off tape."  Davis

can only speculate that Chambers's alleged threat was recorded on a second tape, and it simply does not follow that the specter of the death penalty would prompt Davis to say that Coffin had been shot.  In sum, we find that the district court properly declined to stay the federal habeas proceedings.

Finally, Davis filed a motion to supplement the record with an affidavit by Marchal Walker, which we carried with the case.  Davis offers the affidavit as additional evidence that there were two recording devices in use during his police interview and that Walker provided two tapes and two transcripts to the prosecution.  Because we find that Davis's ostensible claims related to a second tape are procedurally barred, the motion is denied.

## IV.  CONCLUSION

For the reasons stated, we AFFIRM the district court's denial of habeas corpus relief, we conclude that the district court committed no error in denying Petitioner Davis's request for a stay under *Rhines v. Weber*,  544 U.S. 269, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005), and we DENY Petitioner Davis's motion to supplement the record.

**AFFIRMED.**

32