[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10786

_____

GARY RICHARD WHITTON,

Petitioner-Appellant,

*versus*

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:15-cv-00200-RH

_____

Before ROSENBAUM, NEWSOM, and BRASHER, Circuit Judges.

PER CURIAM:

In 1992, Petitioner-Appellant Gary Richard Whitton was convicted of murder and, based on a unanimous jury recommendation, sentenced to death. The victim was found stabbed to death in a blood-spattered motel room in Destin, Florida. A motel clerk testified that Whitton helped the victim with check-in, and the clerk saw Whitton's car parked outside the victim's room later that night. At trial, the State presented the motel clerk's testimony, blood-spatter evidence from Whitton's boots, and circumstantial evidence that Whitton had robbed the victim and paid outstanding bills with the money. Plus, two jailhouse informants, Jake Ozio and Kenneth McCullough, testified that Whitton confessed to the murder.

But years after Whitton's conviction, both Ozio and McCullough sought to recant their testimony. And postconviction counsel collected additional evidence that could have been presented as mitigation in the penalty phase of Whitton's trial. That evidence included records, testimony from other family members and childhood acquaintances, and a more comprehensive psychological evaluation. So Whitton filed a petition for state postconviction relief and, after the Florida Supreme Court denied relief, a federal habeas petition.

After an evidentiary hearing, the district court denied relief. It granted a certificate of appealability on three claims, which we expanded to include one more (four total). Those claims assert that

23-10786                Opinion of the Court                3

(1) the State presented Ozio's false testimony, in violation of *Giglio*;[1]
(2) appellate counsel was constitutionally ineffective for failing to
investigate McCullough's desire to recant; (3) trial counsel was con-
stitutionally ineffective at the mitigation phase; and (4) the State
improperly commented on Whitton's invocation of his right to si-
lence, in violation of *Doyle*.[2]

After careful consideration of Whitton's claims, and with
the benefit of oral argument, we affirm the district court's denial
of Whitton's petition for habeas corpus on all grounds.

## I.    BACKGROUND

*A. Factual Background*

### 1.    Criminal Offense, Investigation, and Prosecution

On the morning of October 10, 1990, James Maulden[3] was
found stabbed to death in his room at the Sun and Sand Motel in
Destin, Florida. *Whitton v. State* ("*Whitton I*"), 649 So. 2d 861, 863
(Fla. 1994) (per curiam). Maulden's skull was fractured, and he sus-
tained three fatal stab wounds to the chest, as well as stab wounds
to his shoulder, cheek, neck, scalp, and back. *Id.* Blood splatter
spanned the floor, furniture, walls, and ceiling of the motel room,

---

[1] *Giglio v. United States*, 405 U.S. 150 (1972).

[2] *Doyle v. Ohio*, 426 U.S. 610 (1976).

[3] The State, as well as certain record documents, refer to the victim as
"Mauldin." We use "Maulden" because Whitton and the district court use
that spelling.

consistent with "significant bleeding" and "violent combat" for a thirty-minute period. *Id.* at 866.

A motel clerk told police officers that Maulden had checked in the day before, after arriving in another man's car. The man had helped Maulden check in because Maulden was intoxicated. *Id.* After the man accompanied Maulden to his room, the man left. *Id.* But the clerk saw someone get into the man's car, parked near Maulden's room, later that night. *Id.* The clerk gave officers the car's license-plate number. That led them to Whitton's house in Pensacola. *Id.*

The next day, officers visited Whitton's home. He invited them inside, and they took Whitton to the police station for questioning. *Id.* Whitton told the officers he knew Maulden from rehab. He recounted that he had dropped Maulden off at the motel the previous afternoon. At first, Whitton denied having gone back to Maulden's room that night. But Whitton later admitted he had returned there. He said that when he had discovered Maulden dead, he had fled in a panic.

After three hours of questioning, Whitton invoked his right to remain silent. The officers then incarcerated him in the county jail. They seized his jeans and boots, as well as samples from the floor and seat of his car, to analyze for suspected blood stains. And they found $50 in cash in Whitton's possession.

Latent prints from miscellaneous items in Maulden's motel room (an ice bucket, a wine bottle, a sandwich wrapper, and a paper bag) matched neither Maulden's nor Whitton's. But law

enforcement recovered Whitton's prints from a different bag found near Maulden's body.

Whitton's boots contained "medium velocity" blood "spatter" consistent with "a stabbing or a beating" and were targeted by "forceful bloodshed." The blood spatter traveled "from top to bottom" (not bottom up) inside the boots. This contrasted with Whitton's claim that blood from the motel seeped into his socks from "between his boot soles" and "uppers." Whitton also said that he took his socks off and threw them out the window of his car and that he cleaned his boots when he got home.

Over a year after Whitton's arrest, the State offered a plea deal to second-degree murder. But the prosecutor withdrew the plea offer and pursued a first-degree murder conviction and death sentence.

At trial, the State's theory was that Whitton stabbed Maulden after robbing him of cash. The State offered the following evidence. On October 9, Maulden asked Whitton to drive him to Maulden's bank. At the bank, Maulden—who was intoxicated—withdrew his account's balance of $1,135.88. Then, when Maulden and Whitton arrived at the motel, Whitton wrote down a false license-plate number on the registration. The motel clerk noticed and corrected it. The next day, on October 10, Whitton bought gas in Pensacola and paid his car registration fee and two utility bills, totaling about $228. And blood stains on Whitton's boots and in his car matched Maulden's blood type. The motel clerk also testified to having seen Whitton's car parked near Maulden's room and

a man get into that car.  According to the motel clerk, anywhere from ten minutes to two hours could have elapsed between when he first saw the car back at the motel and when he saw someone enter it and leave.

The State also called two key witnesses—Jake Ozio and Kenneth McCullough[4]—who were incarcerated with Whitton at the Walton County Jail.  Both testified that Whitton confessed to the murder.

Ozio was an eighteen-year-old high-school student from Texas who was on spring break in Florida when he was arrested and jailed for burglary and possession of a short-barrel shotgun.  Shortly before Whitton's trial, Ozio was released on probation, and his firearm charge was reduced to a misdemeanor.  At trial, Ozio testified that he overheard Whitton tell McCullough that he had "stabbed the bastard."

For his part, McCullough, who was serving a 15-year sentence for 7 felony convictions, corroborated Ozio's account.  He testified that he did not expect or receive favorable treatment for his testimony.  But he did admit that he was a "close personal friend" of the prosecutor's mother.

Whitton testified in his own defense.  He claimed that he gave a false license-plate number at the motel out of fear that he would be liable for any damage that Maulden caused.  Whitton also

---

[4] Portions of the record spell the last name as "McCollough."  We adopt Whitton's spelling: "McCullough."

said that after he left the motel, he stopped at Maureen Fitzgerald's house, and Fitzgerald told him that Maulden's mother was looking for him. Whitton continued, testifying that he and Fitzgerald tried to call Maulden's mother but could not reach her. Whitton claimed that he returned to the motel to tell Maulden that his mother was looking for him but fled after he found Maulden dead. He said he didn't call the police because he was in shock and didn't want to get involved. As to the bills, Whitton explained that Debra Sims, the former occupant of his house, had recently given him $200 to pay off utility bills incurred during her tenancy.

The defense also called Shirley Zeigler, a DNA analyst from the Florida Department of Law Enforcement. Zeigler testified that although the blood on Whitton's boots was Maulden's blood type, the DNA matched neither Maulden's nor Whitton's.[5]

Besides Whitton and Zeigler, the defense called James "Bill" Graham. Graham had interviewed the motel clerk shortly after the murder. Graham testified that the clerk had told him that only ten to fifteen minutes had gone by between his sightings of the car and the man entering it.

The jury found Whitton guilty of murder and robbery. *Whitton I*, 649 So. 2d at 864.

---

[5] The State retested the blood on Whitton's boots in 2002. The inside of the right boot contained blood from a "mixture of two or more individuals" with the "major donor" matching "the DNA profile of James Maulden." The testing also identified Maulden as a DNA contributor to one area on the left boot and a possible contributor to another area on the right boot.

### 2. The Penalty Phase

At the penalty phase, the State called three witnesses: McCullough, a parole officer, and a forensic pathologist. McCullough testified that Whitton said he had to kill Maulden because Whitton was on parole and did not want Maulden testifying against him. The parole officer confirmed that Whitton was on parole for a robbery conviction at the time. The pathologist testified that the initial blows did not leave Maulden unconscious and that Maulden had defensive wounds on his hand and arm.

For its part, the defense called a mental-health expert, Dr. James Larson. He testified that Whitton had an IQ of 84 (low to normal), a history of alcohol abuse, and was physically and emotionally abused as a child. Whitton's brother Royal and his aunt Ruth McGuinness testified that Whitton's parents were alcoholics, and they abused and neglected him. The defense also called Renee Sims and Shirley George, acquaintances of Whitton, to testify that they trusted Whitton with their children and grandchildren. And Dorothy McGuire testified that Whitton had supported her husband's rehabilitation program.

The advisory jury unanimously recommended a death sentence. The sentencing court imposed the death penalty. In support, it found five aggravating circumstances: (1) Whitton was on parole; (2) Whitton had a previous felony conviction involving the use or threat of violence; (3) Whitton committed the murder for the purpose of avoiding lawful arrest; (4) Whitton committed the murder for pecuniary gain; and (5) the crime was especially

heinous, atrocious, or cruel. The court also found several non-statutory mitigating factors. Those included Whitton's history of child abuse, poverty, and neglect; Whitton's alcoholism; Whitton's low IQ and performance at a sixth-grade level; Whitton's motivation to seek help for his problems; and Whitton's employment and help of others.

On direct appeal, Whitton argued (among other claims) that the State violated his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny by commenting on Whitton's invocation of his right to silence during the police interrogation. *Whitton I*, 649 So. 2d at 864–66. The Florida Supreme Court rejected that argument. It found that there was "no reasonable possibility that the improper comment[s] contributed to Whitton's conviction." *Id.* at 864. It also rejected Whitton's challenges to the heinous, atrocious, or cruel aggravator and avoiding-arrest aggravator. *Id.* at 867. So it affirmed Whitton's conviction and sentence. *Id.*

### 3. Postconviction Developments

The postconviction record includes several developments that Whitton argues undermine the validity of his conviction.

First, during Whitton's direct appeal, his appellate counsel received two letters from McCullough expressing his desire to recant his testimony. In the first, McCullough wrote that he would "sign a sworn statement" saying that (1) the prosecutor "made him a deal to testify"; (2) the prosecutor "told him everything to say" in his testimony; and (3) Whitton "did not teel [*sic*] him anything about the crime." Whitton's trial counsel eventually met with

McCullough.  During that meeting, Whitton's trial counsel apparently told McCullough that he "would help in [McCullough's perjury] prosecution."  So in his second letter, McCullough wrote that "he would only talk to" Whitton's "appellate counsel and an investigator."  Despite telling Whitton that she would "pursue" McCullough's recantation, appellate counsel never contacted McCullough, and he died before the start of Whitton's habeas proceedings.

Second, George Broxson, McCullough's cellmate, testified that McCullough "made an offer to the state attorney's office and the sheriff and worked out a deal" to keep his sex-related criminal charges from becoming widely known.  Whitton's habeas counsel later learned McCullough and the prosecutor's mother, Inez Adkinson, were engaged to be married and moved in together after McCullough's release.

Third, in 2000, Ozio swore in an affidavit that his trial testimony was false.  He affirmed that he did not hear Whitton confess to McCullough.  According to Ozio, after officers told him that he would spend five years in Florida prison for his crimes, Ozio made up the confession to try to help himself.  Ozio initially agreed to travel to Florida to testify in postconviction proceedings—even making it to the airport—before learning he could face prosecution for perjury because of contradictory statements.  The State refused to provide assurances that Ozio would not be prosecuted.  Ozio consulted a lawyer and then refused to board his flight, saying, "I do not want to be prosecuted; I'm not coming."

Whitton sought to compel Ozio's testimony through Washington state court, where Ozio lived. The postconviction court certified that Ozio was a crucial out-of-state witness. But the Washington court declined to compel Ozio to travel to Florida. Instead, the Washington court concluded that the perjury charges against Ozio constituted undue hardship under state law. The court agreed to oversee a deposition or remote testimony. But at the State's request, the postconviction court excluded any out-of-state testimony. The court reasoned that allowing such a deposition to proceed would thwart Florida's perjury laws.

But Ozio's codefendant, Kevin Wallace, did testify in state postconviction proceedings. He corroborated Ozio's sworn affidavit's account of their dealings with officers. Wallace explained that Ozio was somehow responsible for their lenient treatment in Walton County.

In response, Clayton Adkinson, the State prosecutor, testified. Adkinson denied making any deals or promises for specific testimony. And he said that he "would be surprised" if any officers encouraged Ozio or McCullough to elicit a confession.

Also in the postconviction proceedings, a cab driver testified that Maulden, intoxicated and still drinking, asked him for help finding a sex worker. After Maulden pulled out a large roll of bills to pay the fare, the cab driver warned him to be careful carrying so much cash around. The cab driver said he told Maulden, "[Y]ou're just making yourself a target." Another postconviction witness

added that Maulden told her he had been robbed by a sex worker days before his murder.

### B. *Procedural History*

#### 1. State Postconviction Proceedings

In 1997, Whitton filed a petition for state postconviction relief. *See* FLA. R. CRIM. P. 3.851. He later filed three amendments to that petition. Whitton's last amendment contained 29 claims, and he filed it in November 2004.[6] As relevant here, Whitton claimed that (1) Ozio and McCullough's false testimony violated his *Giglio*/due-process rights; (2) appellate counsel was ineffective by failing to investigate McCullough's desire to recant his false testimony; and (3) trial counsel was ineffective at the penalty phase. *Whitton v. State* ("*Whitton IV*"), 161 So. 3d 314, 322–34 (Fla. 2014) (per curiam). The state postconviction court summarily denied eleven claims and conducted an evidentiary hearing on the remaining eighteen claims. *Id.* at 321–22.

To support his penalty-phase mitigation arguments, Whitton presented the report of Dr. George Woods, a neuropsychiatrist. Dr. Woods diagnosed Whitton with Fetal Alcohol Spectrum

---

[6] Also, in summary dismissals, the Florida Supreme Court twice declined to intervene to prevent the State from re-testing Whitton's boots. *See, e.g.*, *Whitton v. State* ("*Whitton II*"), 824 So. 2d 171 (Fla. 2002) (denying mandamus to prevent retesting); *Whitton v. State* ("*Whitton III*"), 838 So. 2d 560 (Fla. 2003) (dismissing nonfinal-order appeal to prevent retesting).

23-10786                 Opinion of the Court                      13

Disorder, brain damage from left frontal-lobe impairment, alcoholism, and Post-Traumatic Stress Disorder.

Whitton also called two of his childhood teachers, Max Bovee and Irene Erickson. They described the abuse and neglect to which Whitton's parents subjected him and his siblings. Erickson testified that the neglect Whitton endured was the worst she had seen in 28 years of teaching. Similarly, Whitton called his aunt and uncle, Kathy Robinson and Charles Jesmer, and foster parent, Lois Langworthy. They also described the child abuse and neglect, as well as Whitton's brother Michael's "mysterious" death. Beyond these witnesses, Whitton presented affidavits corroborating the abuse from other teachers, siblings, and friends.

The state postconviction court denied relief. And the Florida Supreme Court affirmed. *Whitton IV*, 161 So. 3d at 322.

Beginning with the *Giglio* claim, the court found that Whitton "failed to demonstrate that" Ozio's testimony "was false" because "Ozio refused to testify and Whitton did not seek to have Ozio's affidavit submitted into evidence." *Id.* at 323. And "even if Ozio's trial testimony was false, Whitton ha[d] not demonstrated that the State was aware that Ozio intended to present false testimony," the court said. *Id.* at 324.

Second, the Florida Supreme Court held that Whitton's appellate counsel was not constitutionally ineffective in failing to further investigate McCullough's recantation. *See id.* at 334. It determined that counsel did not perform deficiently, and Whitton could

not establish prejudice given the "overwhelming evidence against" him. *Id.*

Third and finally, as to Whitton's ineffective-mitigation claim, the Florida Supreme Court concluded that the additional evidence was "cumulative," and Whitton could not establish prejudice. *See id.* at 332. The court reasoned that "trial counsel is not deficient simply because postconviction counsel could find a more favorable expert." *Id.* at 333.

Whitton filed a successive state habeas petition based on *Hurst v. Florida*, 577 U.S. 92 (2016). The state court denied relief, and the Florida Supreme Court affirmed. *Whitton v. State* ("*Whitton V*"), 238 So. 3d 724, 725 (Fla. 2018) (per curiam), *cert. denied, Whitton v. Florida*, 139 S. Ct. 328 (2018). Whitton then sought federal habeas relief.

### 2. Federal Habeas Proceedings

In April 2015, Whitton filed a federal habeas petition. In that petition, he reiterated several claims. Among them were the following: (1) the *Giglio* claim regarding Ozio's false testimony; (2) the *Strickland* claim as to appellate counsel's failure to investigate McCullough's recantation; (3) the *Strickland* claim as to mitigation; and (4) the *Miranda/Doyle* claim related to the State's comments on Whitton's silence. In 2016, the district court stayed proceedings until the Florida Supreme Court decided whether *Hurst* applied retroactively on collateral review and until Whitton exhausted his *Hurst* claims in state court.

A few years later, in March 2021, the district court lifted the stay, held oral argument on the *Giglio* claim, and entered an order allowing limited discovery to obtain Ozio's testimony. After Ozio's deposition, the district court ordered additional briefing and oral argument. It then ordered an evidentiary hearing. In doing so, it found that the Florida Supreme Court's resolution of Whitton's Ozio-related *Giglio* claim was unreasonable under § 2254(d) and that Whitton did not fail to develop the factual basis in state court under § 2254(e)(2).

In September 2022, the district court held the evidentiary hearing. Ozio testified remotely. He said that the officers assigned to Whitton's case took Ozio out of jail several times, including to the pawn shops where Ozio had sold his stolen jewelry. The officers mentioned the five-year mandatory minimum on the firearm charge. But they also mentioned Whitton's case. Ozio believed that he could avoid prison, but only if he "completely cooperate[d]" with the officers on Whitton's case. Based on the officers' "continuous" conversations, Ozio "picked up most everything that they wanted to hear . . . and just regurgitated it back in a different way." But, Ozio testified, he "really didn't have any information to give until [he] overheard it from them." Ozio testified that, in fact, he had never heard Whitton testify to stabbing anyone.

Once Ozio agreed to testify against Whitton, Ozio continued, "it was a night and day change." The officers moved Ozio to a new cell and gave him special privileges. And they took him from the jail additional times and provided him with alcohol and

marijuana. In fact, the officers even took him to "a conjugal visit with a girl that [he] had never met before." Plus, Ozio and Wallace abruptly received probation, and they were released and allowed to return home to Texas.

As for Ozio's testimony at Whitton's trial, Ozio explained how that occurred. Ozio said that before he testified at Whitton's murder trial, he met with a State representative for "three or four hours of grilling." The representative was "to the point" and told Ozio, "This is what I need. No, don't say this. No, that's not the direction we're going." Ozio "was told not to mention" his juvenile record. The representative also told Ozio not to testify to a "knife detail" to which Ozio had alluded in his previous deposition and which apparently came from another case that Ozio had "mixed up."[7] Ozio testified that the prosecutor was "telling [him] to give testimony that was untrue" and "knew pointblank that [he] wasn't telling the truth." Ozio was "scared" and "looking for an out" from

---

[7] In his 1992 pretrial deposition, Ozio testified that he heard Whitton mention a knife that was located in a ravine or a canal behind Whitton's parents' house in Pensacola. But Whitton's parents lived in New York, not Pensacola. The "knife detail" apparently came from another Walton County capital case pending at the time, *Suggs v. State*, No. 1990-CF-338. Whitton filed a motion for judicial notice of the state-court docket and filings in *Suggs*. In 2022, Suggs filed a state postconviction motion citing newly discovered evidence that Clayton Adkinson (also Whitton's prosecutor) had coached jailhouse informants' trial testimony. *See Suggs v. State*, No. 1990-CF-338, Doc. 194 (Walton Cnty. Cir. Ct. May 16, 2022). The informants also claimed that Sheriff McMillan offered them favorable treatment in exchange for their testimony.

the mandatory minimum. And, Ozio testified, he was never served with conditions of probation; it was "almost like it didn't exist."

Ozio confirmed that he would have testified consistently with his affidavit at the state postconviction hearing; he wanted to clear his conscience. But Ozio did not travel to Florida because he was concerned about being arrested and incarcerated for a probation violation. Importantly, Ozio acknowledged that neither the officers nor the prosecutor explicitly "promise[d]" him anything in exchange for his testimony; it was only "implied." He did testify, however, that prosecutors were aware of his juvenile record.

Whitton called two other witnesses: Ozio's former attorney, Mark Davis, and a former probation officer, Troy Miller. Davis testified that Ozio was sentenced "below the guidelines" range and received a "good" outcome given the charges he faced. Miller testified that Ozio's presentence investigation report ("PSI") and sentencing scoresheet reflected neither Ozio's juvenile record nor his arrest for "terroriz[ing]" his family.

The State called several former officers—Fred Mann, Glenn Adkinson, Brad Trusty, Bill Chapman, Steve Sunday, Allen Cotton, John Peaden, and former Sheriff Quinn McMillan. They testified that they had minimal memory of Whitton's case but would not have made improper deals or encouraged a witness to lie at trial. Still, Trusty testified that, "[o]n occasion," he had "gone to the state attorney's office on behalf of inmates to determine if they could have some sort of break on their case for information." The officers also testified that conjugal visits, alcohol, and marijuana were

not allowed, even for trustees, the officers' label for cooperating inmates. Former prosecutor Clayton Adkinson died before the hearing.

On November 30, 2022, the district court denied relief but granted a COA on three claims: (1) the *Giglio* claim about Ozio's false testimony; (2) the *Strickland* claim as to mitigation; and (3) the *Miranda/Doyle* claim related to the State's comments on Whitton's silence. We expanded the COA to include Whitton's *Strickland* claim on appellate counsel's failure to investigate McCullough's recantation.

## II.    STANDARDS OF REVIEW

We review a district court's denial of habeas relief de novo. *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005). We also review mixed questions of law and fact de novo. *Pye v. Warden, Georgia Diagnostic Prison*, 50 F.4th 1025, 1034 (11th Cir. 2022) (en banc). But we review district courts' factual findings for clear error. *Campbell*, 416 F.3d at 1297. That is a highly deferential standard of review. "A finding that is plausible in light of the full record—even if another is equally or more so—must govern." *In re Wagner*, 115 F.4th 1296, 1305 (11th Cir. 2024) (cleaned up).

## III.    DISCUSSION

Beyond these traditional standards of review, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") further limits our role in reviewing state criminal convictions. A federal court "shall not" grant habeas relief on a "claim that was adjudicated on the merits in State court proceedings" unless the State decision (1)

"was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. §2254(d); *see generally Williams v. Taylor*, 529 U.S. 362 (2000).

As to the first prong of § 2254(d), a "state court decision is contrary to clearly established federal law if the state court either arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Davis v. Sellers*, 940 F.3d 1175, 1185 (11th Cir. 2019) (cleaned up). A state court decision is an "unreasonable application of Supreme Court precedent if it identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case." *Id.* (cleaned up). This is a high standard—the "state court's ruling" must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The second prong of § 2254(d) "requires that we accord the state trial court substantial deference" with respect to its factual determinations. *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). We can't grant relief "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an unreasonable determination of the facts and isn't based on any such determination." *Pye*, 50 F.4th at 1035

(internal quotation marks omitted).  And "a determination of a factual issue made by a State court shall be presumed to be correct," rebuttable by a petitioner only upon "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Also, when state-court decisions rest on independently dispositive reasons, all "are due AEDPA deference."  *Hammond v. Hall*, 586 F.3d 1289, 1332 (11th Cir. 2009).  And habeas relief "is due to be rejected" unless every independent reason contravenes or unreasonably applies Court precedent.  *Id.*  We may go beyond the state court's "particular justifications" for reaching its holding and "consider additional rationales that support the state court's" decision. *Pye*, 50 F.4th at 1038.  Or we may skip altogether the question whether the state court acted unreasonably—and thus whether AEDPA's deferential standard of review applies—if the petitioner "cannot show prejudice under *de novo* review, the more favorable standard of review."  *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

We apply these principles to the four claims in Whitton's Certificate of Appealability: (1) the State presented Ozio's false testimony in violation of *Giglio*; (2) appellate counsel was constitutionally ineffective for failing to investigate McCullough's desire to recant; (3) trial counsel was constitutionally ineffective at the mitigation phase; and (4) the State improperly commented on Whitton's invocation of his right to silence in violation of *Doyle*.

>    A. *Whitton's* Giglio *claims fail because he has not shown that the State knew or should have known that its prosecutors*

> *knowingly elicited false testimony and because he cannot estab-
> lish harmful error.*

*Giglio* error is a type of *Brady* error. It happens when the evidence the government failed to disclose shows that "the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury." *United States v. Stein*, 846 F.3d 1135, 1147 (11th Cir. 2017) (quoting *Ford v. Hall*, 546 F.3d 1326, 1331 (11th Cir. 2008)); *see also Giglio v. United States*, 405 U.S. 150, 153 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To prove his *Giglio* claim, Whitton must show two things: "(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material *i.e.*, that there is any reasonable likelihood that the false testimony could have affected the judgment." *Stein*, 846 F.3d at 1147 (quoting *Ford*, 546 F.3d at 1331–32). *Giglio*'s traditional "materiality standard is more defense-friendly than *Brady*'s," requiring the State to show that "the false testimony was harmless beyond a reasonable doubt." *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1348 (11th Cir. 2011) (cleaned up).

But on collateral review, a petitioner must meet the more onerous standard in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Under this standard, we may grant relief "only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Davis v. Ayala*, 576 U.S. 257, 267–68 (2015) (internal quotation marks omitted). There must be "more than a reasonable possibility

22                    Opinion of the Court                    23-10786

that the error was harmful." *Id.* at 268 (internal quotation marks omitted).

If we "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error," we "must conclude that the error was not harmless." *Granda v. United States*, 990 F.3d 1272, 1293 (11th Cir. 2021) (quoting *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1114 (11th Cir. 2012)). So "*Brecht* can prevent a petitioner from obtaining habeas relief even if he can show that, were he raising a *Giglio* claim in the first instance on direct appeal before a state appellate court, he would be entitled to relief." *Rodriguez v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1277, 1302 (11th Cir. 2014). The Supreme Court has explained that we apply such an onerous standard because states should "not be put to the arduous task of retrying a defendant based on mere speculation that the defendant was prejudiced by trial error." *Ayala*, 576 U.S. at 268 (cleaned up).

Whitton argues the State violated *Giglio* when it introduced three false pieces of testimony that prejudiced the outcome of his case: (1) that Ozio overheard Whitton confess to "stabb[ing] the bastard"; (2) that Ozio received no benefits from the State in exchange for his testimony; and (3) that Ozio had no criminal history. And Whitton challenges the Florida Supreme Court's disposition of his *Giglio* claim as both an unreasonable application of *Giglio*, *see* 28 U.S.C. § 2254(d)(1), and based on an unreasonable determination of the facts, *see id.* § 2254(d)(2). He claims the Florida Supreme

Court erred in six ways—two legal and four factual. And he argues we should not afford AEDPA deference to the Florida Supreme Court's decision.

But for two reasons, we need not consider his arguments that the Florida Supreme Court acted unreasonably. First, most of Whitton's claims do not survive de novo review. *See Berghuis*, 560 U.S. at 390. And second, we can't say that the Florida Supreme Court unreasonably concluded that, even without both Ozio's and McCullough's confessions, the State marshalled "overwhelming evidence against Whitton." *Whitton IV*, 161 So. 3d at 334. In other words, the alleged errors did not prejudice Whitton.

### 1. Whitton failed to establish a material *Giglio* violation.

We take each of the alleged *Giglio* violations in turn: (1) the State knew or should have known Ozio fabricated Whitton's confession; (2) the State knew or should have known Ozio lied about not receiving favorable treatment for his cooperation; and (3) the State knew or should have known that Ozio had a criminal history.

> #### i. *Whitton failed to show that the State knew or should have known that Ozio falsely testified about Whitton's purported confession.*

We assume without deciding that Ozio falsely testified that he overheard Whitton's confession that he killed Maulden, as the district court found. Whitton then bears the burden of showing "the prosecutor knowingly used [that] perjured testimony or failed to correct what he subsequently learned was false testimony." *Stein*, 846 F.3d at 1147 (quoting *Ford*, 546 F.3d at 1332).

The Florida Supreme Court concluded that Whitton failed to meet that burden.  That is, it determined he failed to show "that the State was aware that Ozio intended to present false testimony." *Whitton IV*, 161 So. 3d at 324.  The district court reached the same conclusion.  It explained that "the state did not know, and had no way of knowing," that Ozio's "testimony was false" and that, at the time Ozio testified, there was not "a high probability that" his testimony "was false."

Whitton disputes these findings and conclusions.  He claims the district court found only that the prosecution team lacked actual knowledge and did not resolve the issue of constructive knowledge, which the record supported.  In Whitton's view, "[t]he only plausible inference" from Ozio's postconviction testimony is that the prosecutors elicited his trial testimony with "reckless disregard for [the alleged confession's] falsity."

But neither our precedent nor the facts support Whitton's position.  To understand why, we must quickly review some basic *mens rea* principles.  Criminal law typically employs four levels of *mens rea*: purposefulness, knowledge, recklessness, and negligence. MODEL PENAL CODE § 2.02(2) (Am. L. Inst. 1962).  As for knowledge, its routine application is self-explanatory: a person actually knows a relevant fact.  "By contrast, a reckless [individual] is one who merely knows of a substantial and unjustified risk" that a relevant fact is true.  *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 770 (2011) (internal citations omitted).

And "a negligent [individual] is one who should have known of a similar risk but, in fact, did not," *id.*, because the individual deviated from the relevant standard of care that a reasonable person would observe, *see* MODEL PENAL CODE § 2.02(2)(d).

That said, this articulation of the negligence standard spurs the parties' dispute because it resembles the *Giglio* standard—knew or should have known, *Stein*, 846 F.3d at 1147—that we've recounted. And Whitton argues that we've endorsed a *mens rea* standard akin to negligence: "constructive knowledge based on red flags to falsity." The State argues otherwise. It asserts our "should have known" language refers to actual knowledge that we impute as a matter of law to the prosecutors, not a duty to resolve the potential falsity of each witness's testimony. Both parties are partially correct. But ultimately, under our precedent, Whitton failed to show the State "should have known" that Ozio's testimony was false.

Whitton is correct that our "should have known" standard may apply to more than just cases of imputed actual knowledge. We impute state agents' actual knowledge to the prosecutor because "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). So we deem a prosecutor's "constructive knowledge" to be as extensive as any actual knowledge a prosecutor would have acquired had she adequately performed her relevant duties, *see United States v. Robinson*, 627 F.3d 941, 951–52 (4th Cir. 2010)

(describing the "duty to learn" as "constructive knowledge"); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (same), such as studying all relevant case files, *see Glossip v. Oklahoma*, 145 S. Ct. 612, 627 (2025) (explaining "the prosecution knew Sneed's statements were false as he testified to them" in part because the "prosecution almost certainly had access to Sneed's medical file," which would have disproved his testimony).

But the State is correct about the dispositive legal question: a prosecutor does not have the duty to ensure the accuracy of a witness's testimony when the prosecutor does not "believe[] the testimony to be false or perjured." *United States v. Brown*, 634 F.2d 819, 827 (5th Cir. 1981) (adding "it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements"); *see United States v. Noriega*, 117 F.3d 1206, 1221 (11th Cir. 1997) (explaining "willful blindness . . . might establish constructive knowledge"); *see also Glob.-Tech Appliances*, 563 U.S. at 770 (noting "willful blindness . . . surpasses recklessness and negligence" because "the defendant must take deliberate actions to avoid learning of" a relevant "fact").[8]

We've been clear that prosecutors are not guilty of misconduct simply by adducing evidence that is not completely uncontradicted by other evidence. For instance, we've explained that "a prior statement that is merely inconsistent with a government

---

[8] All decisions the Fifth Circuit issued by the close of business on September 30, 1981, are binding precedent in this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

23-10786                Opinion of the Court                27

witness's testimony is insufficient to establish prosecutorial misconduct." *United States v. McNair*, 605 F.3d 1152, 1208 (11th Cir. 2010); *see also United States v. Michael*, 17 F.3d 1383, 1385 (11th Cir. 1994) ("We refuse to impute knowledge of falsity to the prosecutor where a key government witness' testimony is in conflict with another's statement or testimony."). And we've held that "witnesses' capacity to remember events" or witnesses' "possible motives and individual relationships with" other relevant characters "may be considered as factors in weighing their testimony." *United States v. Lopez*, 985 F.2d 520, 524 (11th Cir. 1993). But the fact that witnesses remember "incidents and participants differently" and tell "different stories falls far short of establishing that the government had knowledge of false testimony being presented to the jury." *Id.* Those considerations go to "credibility," which the "defense" may challenge in its "case." *Id.*

On the other hand, the prosecution does have a duty to disclose impeachment "evidence affecting" witnesses' "credibility." *Giglio*, 405 U.S. at 154. Unless the prosecution—or someone from whom the prosecution has a "duty to learn"—has knowledge of testimony's falsity, then the government may present that evidence so long as it has disclosed to the defense relevant impeachment material. *See Ventura v. Att'y Gen., Fla.*, 419 F.3d 1269, 1276 (11th Cir. 2005) (explaining *Giglio* error occurs when "*undisclosed evidence* demonstrates that the prosecution's case included perjured testimony" (emphasis added) (citation omitted)). The jury may then judge the veracity of the alleged false testimony.

But Whitton does not argue that the prosecution failed to disclose relevant impeachment material.  Instead, Whitton argues the prosecution knew Whitton did not confess to Ozio when Ozio testified to the opposite effect.  And under our precedent governing false-testimony claims, the statements Ozio made before and during trial—which Whitton claims include inconsistencies as to the timing, content, and language of the alleged confession—do not give rise to such a *Giglio* violation.  That's so because Whitton hasn't shown that either the prosecutors or any relevant state official actually knew Ozio fabricated Whitton's confession when he testified to it.  *Cf. Glossip*, 145 S. Ct. at 627 (finding a due-process violation where "the prosecution knew Sneed's statements were false as he testified to them").

To be sure, Whitton argues the prosecution knew Ozio's testimony was false.  But he bases his argument on the following four circumstances: (a) Ozio had a motive to fabricate a confession to obtain favorable treatment, (b) officers, in discussing Whitton's case with Ozio, influenced Ozio's understanding of Whitton's case, (c) Ozio included in his recounting of Whitton's confession a false knife detail that actually occurred in another case Clayton Adkinson was also prosecuting, and (d) the prosecution coached Ozio to testify to information Ozio said was false.  And the district court rejected those arguments and found that "the circumstances did not show conclusively or with a high probability that" Ozio's testimony "was false."  We can't say that finding was clearly erroneous.

As to Ozio's motive to provide false testimony, knowledge of a motive to falsify testimony does not equal knowledge of false testimony. Witnesses routinely testify on behalf of the government after pleading guilty—even after pleading to lesser charges or receiving lenient sentences. But that fact does not mean a witness's testimony is false, much less make a prosecutor guilty of misconduct by eliciting it. Rather, a witness's motive for his testimony is a bias the defense may explore on cross-examination. *See, e.g.*, *United States v. Thayer*, 204 F.3d 1352, 1355 (11th Cir. 2000) (per curiam). And here, the district court found that no officer or prosecutor offered Ozio favorable treatment in return for specific testimony, like Whitton's confession. So the district court did not clearly err in discounting Ozio's motive to obtain beneficial treatment in finding the prosecutors did not have actual knowledge that Ozio testified falsely.

Nor did the district court clearly err in finding that the state officers who accompanied Ozio to pawn shops to collect stolen property did not know Ozio's testimony was false. That is a "plausible" finding on this record. *In re Wagner*, 115 F.4th at 1305.

Although the officers could have influenced Ozio's recollection of Whitton's alleged crime in their conversations on the way to the pawn shops, this record does not establish that the officers knew Ozio was lying about Whitton's confession. As the district court found, "[n]o officer told Mr. Ozio anything the officer did not believe was true," and "[n]o officer suggested to Mr. Ozio that he should provide false testimony."

Nor did Ozio's conversations with the officers appear to influence the substance of his testimony. In fact, Ozio could not distinguish among which information he gathered from his conversation with the officers who drove him to the pawn shops, from correctional officers in the jail, or from other detainees. The only detail about Whitton's case that Ozio could link to his car ride to the pawn shop was about the blood on Whitton's clothes. But Ozio testified that he also overheard that detail from Whitton while in jail. Plus, Whitton's confession—the "I stabbed the bastard" comment—did not originate in Ozio's ride-along conversations. So the record does not reveal that the officers knew of anything that contradicted the core of Ozio's testimony about Whitton's confession.

For similar reasons, neither the false knife detail in Ozio's testimony nor the prosecution's preparation with Ozio for his testimony establish that the prosecution knew Ozio was lying, either. Ozio recounted that, in preparing him to testify at Whitton's trial, the prosecution frequently "correct[ed] [him] about dates and . . . about [the] sequence of events." And when Ozio brought up his recollection of Whitton tossing a knife into a ravine, the prosecution suggested that Ozio not volunteer that detail.

But Ozio also explained to the district court that the prosecution never asked Ozio to testify to false information, and the team never instructed Ozio to lie if asked directly about the knife. So the district court found that the prosecution reasonably could have believed that Ozio "heard talk of this around the jail and mixed up the cases."

23-10786                Opinion of the Court                31

The district court had a plausible basis for finding that the prosecution did not know Ozio's testimony was false. Knowledge of testimony that is inconsistent with other evidence and testimony—and witness preparation de-emphasizing those inconsistencies—is not the same thing as knowledge that a witness testified falsely. *See Jacobs v. Singletary*, 952 F.2d 1282, 1287 (11th Cir. 1992) (explaining "the fact that state detectives failed to corroborate her testimony after interviewing three other cellmates . . . rendered [her] testimony only less credible, not incredible"); *cf. Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (finding a due-process violation where a prosecutor elicited testimony that "gave the jury the false impression" that a witness's relationship with the defendant's wife was that of casual friendship although the prosecutor "knew" it was, in fact, sexual).[9]

---

[9] This is not to say prosecutors should attempt to correct or influence a witness to testify to something other than what the witness believes to be true, even if the prosecutors believe they are aligning a witness's inaccurate testimony to the truth. They shouldn't. *See In re Eldridge*, 82 N.Y. 161, 171 (1880) ("[An attorney's] duty is to extract the facts from the witness, not to pour them into him; to learn what the witness does know, not to teach him what he ought to know."); *Geders v. United States*, 425 U.S. 80, 90 n.3 (1976) ("An attorney must respect the important ethical distinction between discussing testimony and seeking improperly to influence it."). And we repeat the district court's admonition against such behavior. Indeed, that misconduct may jeopardize the validity of a conviction. *See, e.g., Kyles*, 514 U.S. at 443 (concluding disclosure of a witness's original statement, which contained "adjustments" at trial, would have "destroy[ed] confidence in [his] story and rais[ed] a substantial implication that the prosecutor had coached him to give it"). But for the reasons

Finally, even considering each of these facts together, they do not show that the district court clearly erred in concluding the prosecution neither knew nor should have known that Ozio's testimony was false. Ozio confirmed that no member of the prosecution team suggested that he testify that Whitton confessed to the crime. And Ozio was consistent that Whitton confessed to the murder. Plus, at the time, McCullough corroborated that Whitton confessed to the murder. So the prosecutors could have believed that Whitton confessed to the murder, even if they were unsure Ozio had a firm grasp of some relevant details about Whitton's crime.

Whitton failed to establish his first alleged *Giglio* violation because he didn't establish that the prosecution team knew or should have known Ozio falsified Whitton's confession when the prosecution elicited the confession at trial.

> ii.  *Whitton failed to show the State agreed to a deal that Ozio testify against Whitton in exchange for benefits, and he failed to show that the State adduced material, false testimony when it allowed Ozio to disclaim his subjective anticipation of benefits from the State.*

Whitton next argues the State failed to correct Ozio's testimony about the benefits he received from the State in exchange for his testimony against Whitton.

---

we've explained, on this record, it does not establish the asserted *Giglio* violations.

23-10786                Opinion of the Court                33

To recap, at trial, Ozio testified that state officers did not "promise or offer [him] any help for [his] statement." Ozio further testified that he "never at any time" thought that testifying against Whitton "was going to help [him] in any way" and that he "didn't think [he'd] be going to prison, [that] being [his] first offense." But in his postconviction affidavit and testimony, Ozio recounted the various benefits he received from the State in exchange from his testimony: his "trustee" privileges, reduced misdemeanor charges, a sentence of probation, and even a conjugal visit and access to alcohol and marijuana.

Ozio testified at his postconviction deposition that he was "fear[ful] of [the mandatory minimum] charge," and he said that officers "portrayed it as a situation that [he] probably wasn't going to get out of." That said, at the federal evidentiary hearing, Ozio acknowledged that neither the officers nor the prosecutor explicitly "promise[d]" him anything in exchange for his testimony; any promise was "implied," Ozio clarified, because the officers "informed [him] that the only way [he] was going to get any actual help was to completely cooperate" regarding "Whitton's case."

These facts prompt two theories of potential *Giglio* violations. First, the State could have presented false testimony had the State and Ozio reached some form of agreement. And second, the prosecutors could have presented false testimony if they knew Ozio was testifying with the hope of receiving benefits from the State. The district court rejected both those theories. And we find neither error in its conclusions nor clear error in its findings.

34                    Opinion of the Court                    23-10786

Starting first with the theory that the State and Ozio reached an agreement about leniency and other benefits in exchange for Ozio's testimony against Whitton, the district court found that Ozio "testified truthfully that he was promised nothing in exchange for the false testimony." So it concluded no *Giglio* violation had occurred. The district court reasoned that Ozio "*hoped* to obtain favorable treatment, and in fact he *did* obtain favorable treatment," but "a unilateral hope is much different from an offer, promise, or mutual agreement."

Whitton argues the district court erred because *Giglio* "applies not only to undisclosed explicit promises from the State in exchange for testimony, but also to undisclosed implicit agreements or understandings." And that is true. We've reasoned, "*Giglio* does not require that the word 'promise' . . . must be specifically employed." *Brown v. Wainwright*, 785 F.2d 1457, 1464–65 (11th Cir. 1986). But a *Giglio* violation contemplates at least a "bilateral agreement" or an offer "subject to acceptance." *Id.*; *see Alderman v. Zant*, 22 F.3d 1541, 1554–55 (11th Cir. 1994) (concluding the *Giglio* "rule states that there must be a full disclosure of any agreements" but "does not address nor require the disclosure of all factors which may motivate a witness to cooperate"); *cf. Haber v. Wainwright*, 756 F.2d 1520, 1524 (11th Cir. 1985) (remanding for further factfinding on whether a prosecutor's "advice . . . amounted to a grant of immunity or otherwise constituted an agreement or understanding between Brandt and the state").

23-10786                Opinion of the Court                35

Here, though, the district court found no such agreement—a finding we can't say is clearly erroneous.  The only testimony that calls into question the district court's finding is Ozio's assertion that state officers, on pawn-shop rides, informed Ozio "the only way [he] was going to get any actual help was to completely cooperate." But we've upheld district courts' findings that similar statements did not amount to an implicit, mutual agreement.

In *Traver v. Hopper*, for instance, a prosecutor stated, "any co-operation [the witness] gave us and if he told the truth in this matter would be taken into consideration," and the prosecutor subjectively believed (but did not convey) that the witness would not be tried for capital murder if the witness testified for the prosecution. 169 F.3d 710, 716 (11th Cir. 1999).  Under those facts, we accepted the district court's finding—"because it [was] not clearly erroneous"—"that whatever exchange may have taken place between" the prosecutor and the witness "did not ripen into a sufficiently definite agreement" that would require disclosure under *Giglio*.  *Id*. at 717. "Some promises, agreements, or understandings do not need to be disclosed," we added, "because they are too ambiguous, or too loose or are of too marginal a benefit to the witness to count." *Id*. And confirmation that a witness's testimony would be "taken into consideration" was "too preliminary and ambiguous to demand disclosure." *Id.*; *see also Depree v. Thomas*, 946 F.2d 784, 797–98 (11th Cir. 1991) (holding promise to "take care" of witness does not require disclosure).

So here, although the officers who drove Ozio to the pawn shops gave Ozio the impression that they wished for him to provide any information he possessed implicating Whitton, the district court did not clearly err in finding those impressions did not "ripen into a sufficiently definite agreement before" Whitton's trial. *Traver*, 169 F.3d at 717. To be sure, it's plausible that Whitton was "merely trying to cooperate in hopes of improving [his] bargaining position later." *Id.* But under our binding precedent, Ozio's "hope[s]" that his testimony against Whitton "would result in more favorable treatment" do "not convert ambiguous statements by the State"—like impressions, as the district court put it—"into promises that [he] would, in fact, receive more favorable treatment." *Depree*, 946 F.2d at 798; *see, e.g.*, *id.* at 797 (discussing a promise to "take care" of the witness); *Traver*, 169 F.3d at 716 (addressing prosecutor's "consideration" of a witness's cooperation).

Indeed, even though Ozio received favorable treatment after the fact, and even if the State subjectively intended to give favorable treatment to Ozio after the fact, under our precedent, those considerations do not transform infirm statements about leniency or benefits into real agreements within the scope of *Giglio*. *See, e.g.*, *Hays v. Alabama*, 85 F.3d 1492, 1499 (11th Cir. 1996) (rejecting argument that Alabama's failure to prosecute a witness after giving favorable testimony amounted to proof of an agreement with the State); *Traver*, 169 F.3d at 716–17 (upholding finding of no agreement even though prosecutor "believed" the witness "would not be tried for capital murder if" the witness "testified for the prosecution").

So as to the first theory of a potential *Giglio* violation, Whitton failed to prove the existence of an implicit agreement that would make the State guilty of misconduct.

As for Whitton's second theory that the State knew Ozio cooperated with the hope of receiving favorable treatment but permitted him to testify otherwise—specifically, that the State allowed Ozio to falsely state he didn't think testifying against Whitton "was going to help [him] in any way"—the district court rejected it. It found that the prosecution "did not know" Ozio's "testimony" concerning his anticipation of benefits "was false—only Mr. Ozio had personal knowledge of his own motives."

Whitton contests that finding as clearly erroneous. He says the ride-along officers impressed upon Ozio that he could benefit from testifying against Whitton, and the State prosecutor, Adkinson, knew of the "condition" of probation placed on Ozio to "return to testify truthfully in [the] Whitton case." We agree that suggests the State knew Ozio testified with the hope of receiving favorable treatment. But even so, on this record, it does not amount to a *material Giglio* violation.

Defense counsel cross-examined Ozio about his reduced charges and sentence of probation, as well as his desire to "help" himself. Whitton's counsel emphasized that before Ozio reported to Florida authorities that Whitton confessed, Ozio faced numerous charges, some of which included mandatory minimum sentences of five years each. Then, after Ozio implicated Whitton, the defense emphasized, the State allowed Ozio to plead guilty to lesser

charges that did not include any mandatory minimum sentence. And ultimately, in closing, the prosecution admitted that "perhaps [Ozio] received a break in regards to probation versus the maximum of three and a half that he could have gotten in prison," even though it argued that Ozio received leniency because he was a first-time offender. So the jury had the facts to infer that the prosecution and Ozio reached some type of an agreement in exchange for his testimony.

And Ozio's refusal to acknowledge an agreement, or even a selfish motivation on his part to testify against Whitton, could have further undermined his credibility. As the district court put it, "[a] cooperating witness's denial of any desire for favorable treatment rarely helps the proponent of the testimony." So the testimony Ozio gave at trial was, at a minimum, just as persuasive, if not less persuasive, than it would have been had he candidly explained he hoped the prosecution would look favorably upon his reporting of Whitton's confession. At bottom, defense counsel's impeachment of Ozio on his motivation to testify makes any related *Giglio* violation immaterial. *See McNair*, 605 F.3d at 1211 (finding no reversable error, in part, because the jury was aware the witness "had made a plea deal and that the government's assessment of his cooperation would impact his eventual sentence").

23-10786              Opinion of the Court                    39

> iii. *Whitton failed to show Ozio's false testimony that he had no criminal history would have had a substantial and injurious effect or influence on the jury's verdict.*

Lastly, Whitton argues the State failed to correct Ozio's testimony on cross-examination that he had "never been arrested before." That testimony was false: Ozio's juvenile records show he was charged with assault with bodily injury against his father, terroristic threats against his mother, and at least one other burglary. The State also had those records, as the district court found. And Whitton adds, the State capitalized on the false testimony by portraying Ozio as a young kid with no criminal past. *See DeMarco v. United States*, 928 F.2d 1074, 1077 (11th Cir. 1991) ("[T]he prosecutor's argument to the jury capitalizing on the perjured testimony reinforced the deception of the use of false testimony and thereby contributed to the deprivation of due process.").[10]

Still, the district court concluded that any such *Giglio* violation would not have made a difference because, in Florida, juvenile criminal records are generally inadmissible to attack a witness's credibility. *See* Fla. Stat. § 90.610(1)(b) (1977); *Benedit v. State*, 575 So. 2d 236, 237 (Fla. 3d DCA 1991). This conclusion was erroneous. There is no indication the trial court would have used Section 90.610 to bar the use of Ozio's juvenile records after Ozio opened the door to such evidence. Florida courts admit juvenile records

---

[10] The State also contends that Whitton failed to exhaust this claim. But because the claim fails on the merits, we do not address the State's exhaustion arguments.

when a "witness, by volunteering that he had never been in trouble before, . . . open[s] the door to [prior] conviction[s], which would not have otherwise been admissible." *Cullen v. State*, 920 So. 2d 1155, 1156 (Fla. 4th DCA 2006); *see also Mosley v. State*, 739 So.2d 672, 677 (Fla. 4th DCA 1999) (collecting cases where a witness was impeached after minimizing his criminal past).

And impeachment concerning Ozio's juvenile record would have undermined his credibility: it would have shown Ozio perjured himself. It also may have solidified the inference that the prosecution struck a deal with Ozio by eliminating the prosecution's argument that Ozio received leniency because he was a first-time offender.[11] Although the prosecution admitted that Ozio caught "a break" by receiving a lenient sentence, it attempted to brush off suggestions of any deals by proffering the applicable sentencing guidelines for a first-time offender like Ozio. Had the jury learned Ozio was not a first-time offender, the prosecution could not have made such an argument. And the jury would have known that Ozio lied on the stand. Such a combination of impeachment

---

[11] Potentially, the pattern of prosecutorial misconduct could have caused the jury to doubt the credibility of the prosecutors themselves. *See Brecht*, 507 U.S. at 638 n.9 (addressing the "unusual case" where "a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict"). But Whitton references this issue in a single-sentence footnote, so we do not address it. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

by perjury and a deal for favorable treatment, we've held, can destroy a witness's credibility. *See, e.g.*, *United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977) (explaining a propensity for dishonesty, combined with evidence of promised favorable treatment, "might well have" caused the jury to conclude the witness "had fabricated testimony in order to protect himself against another criminal prosecution"); *accord Brown*, 785 F.2d at 1466; *cf. Ventura*, 419 F.3d at 1292 & n.9.

So we cannot affirm the district court's decision on its finding of harmless error. Still, we cannot reverse the district court, either, because we must affirm on the other basis the State advances, *see Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001)—that Ozio's testimony, overall, was immaterial to the jury's verdict. *See McNair*, 605 F.3d at 1208 ("When a government lawyer elicits false testimony that goes to a witness's credibility, we will consider it sufficiently material to warrant a new trial only when the estimate of the truthfulness and reliability of the given witness may well be determinative of guilt or innocence." (citation and internal quotation marks omitted)). For the reasons we discuss in the next section, we owe deference to the Florida Supreme Court's determination that, even without Whitton's confession, the State marshalled overwhelming evidence that would have caused the jury to reach the same result.

> 2. Assuming Whitton established *Giglio* violations that materially undermined the veracity of Ozio's testimony, the Florida Supreme Court did not

<u>unreasonably determine that overwhelming evidence supported the jury's conviction.</u>

Under AEDPA, we owe deference to a state court's prejudice determinations. *See Pye*, 50 F.4th at 1041–42. So to pierce AEDPA's veil, Whitton must show the state court's determination that he did not suffer prejudice was an unreasonable application of, or contrary to, federal law. *See id.* In other words, even if we may disagree with the state court's conclusion and would have reached a different one had we taken the first look, we cannot overturn the state court's decision unless it was "so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Id.* (quoting *Shinn v. Kayer*, 592 U.S. 111, 118 (2020)); *see also Harrington*, 562 U.S. at 101.

The Florida Supreme Court considered the weight of the evidence against Whitton, albeit in a roundabout way. It did not directly address prejudice flowing from Ozio's testimony when it considered Whitton's *Giglio* claims. *See Whitton IV*, 161 So. 3d at 323–24 (addressing falsity of Ozio's testimony and the State's knowledge). But in assessing whether a jury could sustain Whitton's conviction without McCullough's testimony, the court described the weight of the evidence against Whitton, independent of both confessions, and found it to be "overwhelming." The court said,

> Further, Whitton cannot establish prejudice. As discussed above, recantations are not credible. Without McCollough's testimony, Ozio's testimony would still

have provided the jury with evidence that Whitton
admitted to murdering Mauldin.  That, coupled with
*the overwhelming evidence against Whitton*, makes it ex-
tremely unlikely that McCollough's recantation
would have changed the outcome of the trial.

*Id.* at 334 (emphasis added).  Unless unreasonable, the Florida Su-
preme Court's conclusion that the non-confession evidence was
"overwhelming" binds us and is dispositive of the prejudice ques-
tion here.  We address this legal conclusion and then delve into the
reasonableness of the Florida Supreme Court's holding that the ev-
idence against Whitton, independent of the confession, was "over-
whelming."

First, the Florida Supreme Court's conclusion that, even
without considering the confessions, there was still "overwhelming
evidence against Whitton" binds us.  That's so because AEDPA re-
quires us to review "the specific reasons given by the state court
and defer[] to those reasons if they are reasonable." *Wilson v. Sellers*,
584 U.S. 122, 125 (2018).  Plus, to ignore the Florida Supreme
Court's determination that the State presented "overwhelming ev-
idence" against Whitton would bypass our rationale in *Pye* that we
should not accept readings of AEDPA that "strictly limit[]" a state
court "to the particular justifications" it "memorialized in its writ-
ten opinion."  50 F.4th at 1039.  As we've made clear, we owe defer-
ence to a state court's implicit yet reasonable findings and conclu-
sions.  *See Blankenship v. Hall*, 542 F.3d 1253, 1272 (11th Cir. 2008)
(explaining "implicit findings of fact are entitled to deference under

§ 2254(d) to the same extent as explicit findings of fact"). And here, they are reasonable.

Second, a lack-of-prejudice holding immediately follows from the Florida Supreme Court's conclusion that, even without Ozio's and McCullough's testimony that Whitton confessed, the State still introduced "overwhelming evidence against Whitton." We've repeated that errors are harmless "under the *Brecht* standard where . . . other evidence of guilt is overwhelming." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1313 (11th Cir. 2012); *accord Trepal*, 684 F.3d at 1114; *Prevatte v. French*, 547 F.3d 1300, 1304 (11th Cir. 2008); *Grossman v. McDonough*, 466 F.3d 1325, 1340 (11th Cir. 2006); *see also Lamb v. Jernigan*, 683 F.2d 1332, 1342 (11th Cir. 1982); *Cape v. Francis*, 741 F.2d 1287, 1294–95 (11th Cir. 1984); *Davis v. Kemp*, 752 F.2d 1515, 1521 (11th Cir. 1985); *Tucker v. Kemp*, 762 F.2d 1496, 1501 (11th Cir. 1985); *United States v. Harriston*, 329 F.3d 779, 789 (11th Cir. 2003). So if the Florida Supreme Court reasonably determined that overwhelming evidence supported Whitton's conviction, we must give deference to its ultimate decision to reject Whitton's habeas petition. *See Pye*, 50 F.4th at 1042 (explaining "some debatable calls as to the weight" of certain "pieces of evidence" did not render unreasonable the "ultimate decision to deny relief").

Third, the Florida Supreme Court reasonably determined that the record contained "overwhelming evidence" of Whitton's guilt. The undisputed facts place Whitton at the scene of the crime the night that Maulden was killed, and evidence suggests Whitton committed the murder: the motel clerk saw Whitton's car parked

23-10786                    Opinion of the Court                    45

at the motel, and Whitton admitted he was at the motel; Whitton's boots and his car were stained with blood that, after later retesting, matched Maulden's DNA; the blood stains on and inside Whitton's boots are consistent with "a stabbing or a beating"; Whitton could not explain the downward blood spatter on the inside of his boots; and Whitton's car contained a power and gas receipt and a car wash ticket for 2:37 a.m. October 10, 1990, the night of the murder.

To be sure, portions of the State's case rely on credibility determinations on which the jury could easily side with Whitton. For instance, the State posits that Whitton murdered Maulden because Whitton was behind on his bills, was about to lose electricity, and knew that Maulden had over $1,000 cash. Yet Whitton testified that he received money from the prior occupant, Debra Sims, because the bills had been incurred during her tenancy. And the State was neither able to recover Maulden's cash nor prove what Whitton spent that money on.

Similarly, as to the State's arguments that Whitton did not report the death of his "pretty close" friend and that Whitton told several lies,[12] Whitton argues that the jury could have believed his allegedly untruthful and irrational actions were driven by panic and

---

[12] The State argues it proved Whitton lied about the following: that Whitton did not know how much money Maulden had despite helping Maulden withdraw his money; that Whitton tried to contact Maulden's mother when she never received a call; that Whitton told the police he did not go back to the hotel when he in fact did; and that Whitton lied to his boss about why he did not show up to work.

fear.  And he urges, that's a credibility question that is front and center after we discount Ozio's and McCullough's testimony.

Then, as to the supposed persuasiveness of the overall case, Whitton highlights the state prosecutors' conduct.  He notes that after discovering Whitton's purported confessions, the State withdrew a plea deal to "stand mute . . . with a guidelines sentence" to second-degree murder and robbery.  Instead, the State sought either life imprisonment or the death penalty.  And after learning of Zeigler's potentially exculpatory DNA testimony, the prosecution team engineered what the district court called an "inexcusable attempt to block" it through verbal and physical assault.  Had the State viewed the evidence against Whitton as "overwhelming," he suggests, the prosecution would not have acted the way it did.

A jury may well find some of these points to be persuasive.  But we cannot say that the state court was "so obviously wrong," *Pye*, 50 F.4th at 1042, in concluding the non-confession evidence against Whitton is "overwhelming."  In particular, Whitton can't rebut the State's blood-spatter evidence.  The inside of Whitton's boots contained blood matching the victim's type and were the "target for forceful bloodshed" and "medium velocity" blood spatter consistent with "a stabbing or a beating."  Evidence also suggested that the blood traveled from the top of Whitton's boots to the bottom, directly contradicting Whitton's testimony that he was in Maulden's room for only a minute before fleeing.  Notably, the State's expert rebutted Whitton's theory that blood seeped into his boots through their bottoms by testifying that some of the

downward blood spatter had dried before Whitton put his boots back on; Whitton could not have been wearing his boots when "the blood spatter occurred on the interior of" them.

Whitton responds that the State could not explain the limited amounts of blood on Whitton clothes, boots, and in his car, considering the extremely bloody scene—officers reported that blood covered at least three walls. To this, Whitton adds that the DNA evidence matched a third party, not Maulden or Whitton. But the State introduced expert testimony that effective washing can eliminate traces of blood, as well as evidence that Whitton attempted to wash away the blood he collected in Maulden's motel room. Indeed, Whitton purchased a car wash ticket, dated 2:37 a.m. on the night of the murder. And an officer reported that Whitton said he washed his boots, although Whitton disclaims making such a statement.

Also, after retesting the DNA on Whitton's boots, *see, e.g.*, *Whitton II*, 824 So. 2d at 171; *Whitton III*, 838 So. 2d at 560, the State confirmed that the inside of Whitton's right boot contained blood from a "mixture of two or more individuals" with the "major donor" matching "the DNA profile of James Maulden." In short, the blood-spatter evidence ties Whitton directly and firmly to Maulden's murder.

So we can't say it was unreasonable for the State court to conclude there was "overwhelming evidence against Whitton." *Whitton IV*, 161 So. 3d at 334. Nor does Supreme Court precedent preclude the prejudice finding the State made on these facts.

Rather, even if the "call[]" is ultimately "debatable," it's within the realm of fair-minded disagreement, *Pye*, 50 F.4th at 1042, that blood spatter evidence—which has no explanation other than one that is consistent with the defendant's guilt—will surely convince a jury of the defendant's guilt, *see Brecht*, 507 U.S. at 638. *See, e.g., State v. Perkins*, 1999 WL 334974, at *3 (Ohio Ct. App. May 28, 1999) (holding "blood spattered" on defendant's "T-shirt and jeans," as well as DNA testing proving the spatter matched the victim, "presented overwhelming evidence of" the defendant's guilt).

Because the state court's prejudice determination "wasn't contrary to or an unreasonable application of the Supreme Court's precedents, based on an unreasonable determination of the facts, or 'so obviously wrong that its error lies beyond any possibility for fairminded disagreement,'" AEDPA requires us to defer to its "weighing of the evidence" and "cumulative-prejudice conclusion." *Pye*, 50 F.4th at 1056 (quoting *Shinn*, 592 U.S. at 118); *see also Harrington*, 562 U.S. at 102 ("If this standard is difficult to meet, that is because it was meant to be.").

### B. *Whitton's appellate counsel was not prejudicially ineffective.*

We next turn to Whitton's claim that his appellate counsel was ineffective for failing to investigate McCullough's recantation.

The same standards that apply to trial counsel under *Strickland* also govern claims of ineffective assistance of appellate counsel. *Brooks v. Comm'r, Ala. Dep't of Corr.*, 719 F.3d 1292, 1300 (11th Cir. 2003). To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel "made errors so serious

that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and that the deficient performance prejudiced the defendant by depriving him of a fair trial with a reliable result. *Raheem v. GDCP Warden*, 995 F.3d 895, 908 (11th Cir. 2021) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

An ineffective-assistance showing involves two prongs: performance and prejudice. Under this framework, a petitioner must show both that (1) counsel's representation was objectively unreasonable, and (2) a reasonable probability exists that, without counsel's unprofessional errors, the proceeding's result would have differed. *Id*. We evaluate an attorney's performance by whether it was reasonable "under prevailing professional norms," and we judge that "on the facts of the particular case." *Strickland*, 466 U.S. at 688, 690. In performing our review, we apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689.

And when we perform a *Strickland* analysis within the AEDPA framework, which requires us to defer to state rulings that are not unreasonable, our deference to the state court's determination that counsel has performed adequately is "doubly deferential." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (quoting *Burt v. Titlow,* 571 U.S. 12, 15 (2013)); *see also Raulerson v. Warden*, 928 F.3d 987, 996–97 (11th Cir. 2019) ("Because *Strickland* provides a most deferential standard for assessing the performance of counsel, when we

combine it with the extra layer of deference that § 2254 provides, the result is double deference." (cleaned up)).

Whitton argues that his appellate counsel, Paula Saunders, was constitutionally ineffective in failing to reasonably investigate McCullough's recantation and press for a new trial. But we do not decide the issue of deficient performance because, in any case, Whitton has failed to show that the Florida Supreme Court's prejudice determination was unreasonable.

To establish prejudice based on failure to file a motion, a petitioner must show both that (1) the motion was "meritorious" and (2) a reasonable probability exists that the outcome of the proceeding would have been different if the motion had been granted. *Taylor v. Sec'y, Fla. Dep't of Corr.*, 64 F.4th 1264, 1271 (11th Cir. 2023).

Whitton argues that, had McCullough submitted an affidavit or otherwise recanted his testimony, Saunders could have moved to remand the case for a new trial. Even if the result of the direct appeal would have been unchanged, he adds, Saunders's failure to investigate "caused irreparable harm to" Whitton's postconviction proceedings. In particular, he points to the fact that the Florida Supreme Court found McCullough's recantation unreliable because it was never memorialized. *See Whitton IV*, 161 So. 3d at 323. What's more, Whitton continues, the state trial court "based its finding" of the avoid-arrest aggravator entirely on McCullough's testimony. *Whitton I*, 649 So. 2d at 867. So had Whitton received a new trial, he posits, it is reasonably possible that the trial court would have found one less aggravator at sentencing.

The State responds that it is objectively unlikely the Florida Supreme Court would have granted any motion to relinquish its jurisdiction and remand for a hearing on McCullough's affidavit. Rather, it argues, Whitton's prejudice argument rests on a chain of "speculative events": (1) the Florida Supreme Court would have had to grant Whitton's motion to relinquish jurisdiction to pursue the McCullough-recantation issue; (2) McCullough would have had to give a sworn statement recanting and maintain that recantation at the hearing despite his perjury fears; (3) the trial court would have had to find McCullough's recantation credible; and (4) the Florida Supreme Court would have had to reverse Whitton's judgment on direct appeal.

To be sure, we don't know whether a court would find McCullough's recantation to be credible, especially given his extensive criminal history. And McCullough may have refused to testify out of fear of a perjury prosecution. But we assume for the sake of argument that there is a reasonable probability that the first three "speculative events" would have occurred.

Even so, though, given the substantial evidence against Whitton—the blood spatter, the motel clerk's testimony, Whitton's own admission that he returned to the motel, and other circumstantial evidence—we can't say the Florida Supreme Court unreasonably found that McCullough's recantation was insufficient to warrant a new trial. As we've covered, the Florida Supreme Court concluded Whitton could not establish prejudice on his *Strickland* claim because (1) "recantations are not credible"; (2) "[w]ithout

McCollough's testimony, Ozio's testimony would still have provided the jury with evidence that Whitton admitted to murdering Mauldin"; and (3) Ozio's testimony, "coupled with the overwhelming evidence against Whitton, makes it extremely unlikely that McCollough's recantation would have changed the outcome of the trial." *Whitton IV*, 161 So. 3d at 334. And for the same reasons we explained in the last section, we can't say the Florida Supreme Court's prejudice determination was unreasonable.

Next, we address Whitton's contention that Saunders's failure to investigate and memorialize McCullough's recantation prejudiced Whitton's postconviction proceedings. For this claim, Whitton trains his arguments on the wrong proceeding. The relevant inquiry is whether Saunders's deficient performance prejudiced Whitton's *appeal*, not his future postconviction proceedings. *See Heath v. Jones*, 941 F.2d 1126, 1132 (11th Cir. 1991) (holding prejudice is shown if "the neglected claim would have a reasonable probability of success *on appeal*" (emphasis added)); *cf. also Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006) (explaining "when the claimed error of counsel occurred at the guilt stage of a trial (instead of on appeal) we are to gauge prejudice against the outcome of the trial: whether there is a reasonable probability of a different result at trial, not on appeal"). True, trial and appellate counsel in death-penalty cases *should* act with an eye towards postconviction litigation. As a practical matter, though, a holding that the prejudice prong may be satisfied through an adverse impact on future postconviction litigation would expand the scope of cognizable

*Strickland* claims. So we cannot say the Florida Supreme Court ran afoul of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

And in any event, even if McCullough had signed a sworn statement and testified in the postconviction proceedings, a post-conviction court may well have found that recantation not to be credible. Or a post-conviction court may well have decided any *Giglio* claim the way the district court decided the Ozio-related *Giglio* claim here. In other words, we don't find a reasonable probability that, based on McCullough's recantation alone, Whitton would have obtained postconviction relief.

Even taking McCullough's recantation and Ozio's recantation together, we can't say that "there is a reasonable probability that . . . the result of the [postconviction] proceeding would have been different." *Strickland*, 466 U.S. at 694. That's so because, as we've discussed, the Florida courts determined that otherwise "overwhelming evidence [existed] against Whitton." *Whitton IV*, 161 So. 3d at 334; *cf. also Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1151 (11th Cir. 2022) (concluding "it would not be unreasonable for a jury to credit these witnesses' original testimony and discredit their new versions, just as the [state court] did").

And as to the avoid-arrest aggravator, the sentencing court found four other aggravators: (1) Whitton was on parole; (2) Whitton had a previous felony conviction involving the use or threat of violence; (3) the murder was committed for pecuniary gain; and (4) the crime was especially heinous, atrocious, or cruel. Based on these other findings and this record, we don't see a reasonable

probability that the sentencing jury and court would have declined to impose a death sentence in the absence of the avoid-arrest aggravator. The Florida Supreme Court, after all, has said that the heinous, atrocious, and cruel aggravator "is among the weightiest . . . in the statutory scheme." *Rigterink v. State*, 66 So. 3d 866, 900 (Fla. 2011).

Having rejected each of Whitton's prejudice arguments, we cannot conclude that the Florida Supreme Court's prejudice determination was an unreasonable application of *Strickland*. *See* 28 U.S.C. § 2254(d)(1). We thus affirm the district court's denial of habeas relief on Whitton's claim that Saunders was constitutionally ineffective on appeal.

### C. Whitton's trial counsel was not prejudicially ineffective in marshalling mitigatory evidence in the penalty phase.

Whitton next argues that his trial counsel was constitutionally ineffective at the penalty and mitigation phase of trial.

Penalty-phase counsel has an "obligation to conduct a thorough investigation of the defendant's background" for potential mitigation evidence. *Williams*, 529 U.S. at 396. When we determine the constitutional adequacy of counsel's performance, we look to the practices a typical, adequate counsel undertakes "in preparing for the sentencing phase of a capital trial." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005). Defense counsel's main goal is to counter the State's alleged aggravating circumstances with "evidence in mitigation." *Id.* at 381. Still, to perform adequately, counsel need not "investigate every conceivable line of mitigating evidence no

23-10786                 Opinion of the Court                           55

matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins v. Smith*, 539 U.S. 510, 533 (2003).

As for prejudice, we consider "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Prejudice may occur when newly adduced descriptions and details about the defendant's "depth of abuse . . . far exceeded what the jury was told." *Johnson v. Sec'y, DOC*, 643 F.3d 907, 936 (11th Cir. 2011).

We agree with Whitton that counsel could have presented a more compelling mitigation case here. But even so, we can't say that the Florida Supreme Court's no-prejudice determination was an unreasonable application of *Strickland*. To explain why, we first recount the relevant mitigation evidence from trial and from post-conviction proceedings. Then we discuss the Florida Supreme Court's application of *Strickland*'s prejudice principles.

### 1. Additional mitigation evidence from postconviction proceedings

James Tongue handled Whitton's penalty-phase defense. Tongue had worked at the public defender's office for less than three years and had only second-chaired a capital case. He was in private practice beforehand and had never handled a felony criminal case. In postconviction proceedings, he testified that his mitigation strategy was to humanize Whitton and focus on his present good deeds.

According to his notes, Tongue spoke to three family members, all on the same day, but did not attempt to contact any of Whitton's other (seven) siblings. Tongue did not find it necessary to travel to New York (where Whitton grew up) to speak to Whitton's family members. He did not contact Whitton's teachers, foster parents, aunts and uncles (besides his aunt Ruth), or other childhood acquaintances. Nor did he request welfare or foster-care records, records of Whitton's brother's death, or other records from Whitton's childhood.

At the penalty phase of trial, Whitton's brother Royal testified that their parents drank daily, someone was whipped daily, their mother Dot would put their heads in the toilet, and their father Roy threw Whitton into a wall once. Royal said the kids tore plaster off the walls of their room to burn for heat. The children slept on the floor or in a bed in one large room with a broken window. And sometimes there was snow on the bed. Royal testified that Whitton was "lucky" because Royal got most of the abuse in the family.

Whitton's aunt Ruth testified at trial that she never saw Whitton's father abuse him. And though she testified to specific incidents of Whitton's mother's abuse, only one involved Whitton directly: When Whitton was four or five, his mother forced him to sit outside in the snow in wet clothing rather than come into the house. Ruth also testified that Whitton's mother fed her babies paregoric and wine and would often slap, hit, or throw her children.

Valerie Brookins, Whitton's sister, attended the trial. But the defense did not call her as a witness. Instead, the defense told her, "We don't need you." Yet Tongue testified that had a family member with potentially helpful testimony attended the trial, he would have called that family member.

Tongue also called a mitigation expert, Dr. Larson. Dr. Larson spoke to Whitton for only two hours. His primary task was to evaluate Whitton for competency. Dr. Larson believed that he could not opine on non-statutory mitigators because Whitton "denie[d] any wrongdoing relative to the charges."

After Whitton's conviction, two of Whitton's siblings swore in affidavits that they believed Whitton's mother killed their brother Michael by beating him to death, based on stories from other relatives. Dr. LeRoy Riddick, a forensic pathologist who reviewed Michael's autopsy, testified at the postconviction hearing that Michael "died from blunt force injuries" and "child abuse."

Other Whitton siblings confirmed that their father beat his children with "belts, branches, and fists—anything [he] could get his hands on." In his affidavit, Timothy Whitton recounted a time his father "threw [him] head first through a wall," after which he had to wear an eye patch. The children were starved and in constant fear of their parents. Their father sexually abused Valerie, and their uncle sexually abused several of the Whitton siblings.

Neighbors "describe[d] the Whitton family as the worst family in terms of loving their children, taking care of their children, providing for their children that they had ever seen." The house

had no indoor plumbing, and the beds were constantly urine-soaked. A former babysitter, who reported the parents to the Department of Social Services, recounted "mice and rats running around." Whitton's aunt recounted the "filthy" and "vermin infested" living conditions and lack of health care, even when the children fell ill. The children were teased for poor hygiene and lack of clothing.

The family moved closer to Whitton's great aunt for help with childcare after Michael's death. The parents continued to drink and abuse their children. For example, Dot would sit them in a plastic chair with "wrought iron handles . . . about . . . [the] length of a love seat. . . . [A]nd she would tie them on there with rope." She would also make "them kneel on a five-pound bag of sugar for hours or mak[e] them stand in the corner with a pound brick of butter in each hand with their arms extended."

Whitton's parents separated, and his father requested that the children be put in foster care. By that point, the children were essentially unsupervised; they would ask neighbors to "use the phone frequently in the evenings to call local bars looking for their mother." Dot did not cooperate with the foster-care workers but continued "gallivanting and le[aving] her children alone." Roy "abandoned his job and left," for which the court placed him under a child-support order.

The children bounced around from place to place. Lois Langworthy, Roy's former co-worker, took in the children. At the time, Whitton was "dirty and smelly and virtually without

clothes." But under Langworthy's care, Whitton "began to fit in" and "to improve in school," even attending church. Frustrating these improvements, Roy would pick up Whitton and take him to a "booze joint," providing Whitton with alcohol.

As for Whitton's cognitive functioning, his elementary-school principal, Max Bovee, testified that the school nurse and teachers were concerned about Whitton's motor skills and attention-deficit problems. Bovee opined that Whitton had brain damage and cognitive dysfunction based on his lack of coordination, learning difficulties, and hyperactivity.

Whitton's postconviction expert, Dr. Woods, diagnosed Whitton with Fetal Alcohol Spectrum Disorder, left frontal lobe impairment, alcoholism, and Post-Traumatic Stress Disorder. Dr. Woods opined that Whitton "clearly has impairments of memory sequencing and [in his] ability to weigh and deliberate," indicative of "brain damage." In Dr. Woods's view, the "documented depravity" that Whitton experienced "impairs one cognitively as well as the soul."

Based on his review of Whitton, Dr. Woods testified that, "to a reasonable degree of neuropsychiatric certainty," Whitton qualified for two statutory mitigators: (1) a "substantially impaired" capacity to conform his conduct to the law and (2) an "extreme mental or emotional disturbance." Dr. Woods further opined that Dr. Larson had not diagnosed Whitton with these impairments because he lacked the necessary social and medical information.

Another neuropsychologist, Dr. Barry Crown, opined that Whitton "has a significant neuropsychological impairment impacting language-based critical thinking, information storage and retrieval."

> ### 2. The Florida Supreme Court reasonably determined that missed mitigating evidence did not prejudice Whitton's penalty-phase case.

Whitton argues that Tongue "had no viable strategic reason for not delving into Petitioner's childhood and ensuing trauma" to the extent that postconviction counsel did. And, he claims, a reasonable probability exists that he would have received a different sentence if the mitigation evidence uncovered postconviction had been before the court at sentencing.

The State argues that we cannot reach the additional records and affidavits under AEDPA because they were not admitted as substantive evidence; rather, "they were only admitted for the limited purpose of showing what Dr. Woods relied on in reaching his conclusions." They cannot, in the State's view, support an ineffective-assistance claim. And even if we can consider it as substantive evidence, the State asserts, the additional lay-mitigation evidence was cumulative. The State also argues that the expert claim is "a non-cognizable claim of ineffective-assistance-of-expert."

The Florida Supreme Court characterized both the childhood and mental-health-expert evidence as "cumulative" to that presented at the penalty phase, so it found that Whitton could not establish prejudice. *Whitton IV*, 161 So. 3d at 332. In the district

court's view, this finding was not unreasonable because Tongue "presented a substantial mitigation case" and "[h]e made his point." We affirm that holding.

To make a prejudice determination under *Strickland*, courts must "evaluate the totality of the available mitigating evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397–98. As for our role, we must ensure the Florida Supreme Court did not unreasonably apply federal law, as the Supreme Court of the United States has clearly established it. *See Pye*, 50 F.4th at 1041–42. After considering all the evidence, we conclude that Whitton's case is materially distinguishable from the cases in which we and the Supreme Court have found ineffective penalty-phase assistance and on which Whitton relies—*Williams*, *Wiggins*, *Rompilla*, *Sears*, and *Porter*.

We begin with *Williams*. There, penalty-phase counsel entirely "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood." 529 U.S. at 395. This failure, the Court held, was constitutionally deficient performance. *See id.* at 396. And as for prejudice, the Court found that the "graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Id.* at 398. Here, by contrast, counsel did not altogether fail to undertake a mitigation investigation. And although the presented mitigating evidence was

certainly not as comprehensive as Whitton's postconviction evidence was, the jury did hear "graphic description[s]," *see id.*, of Whitton's childhood abuse.

Similarly, in *Wiggins v. Smith*, the Court found that "[c]ounsel's decision not to expand their [mitigation] investigation beyond the PSI and the [Department of Social Services] records" was constitutionally deficient. 539 U.S. 510, 524 (2003). That failure was prejudicial, the Supreme Court concluded, because the "sentencing jury heard only one significant mitigating factor"—"that Wiggins had no prior convictions." *Id.* at 537. And had "the jury been able to place petitioner's excruciating life history on the mitigating side of the scale," it reasoned, there was "a reasonable probability that at least one juror would have struck a different balance." *Id.* But unlike in *Wiggins*, Whitton's penalty-phase jury unanimously recommended a death sentence even after hearing Royal's and Ruth's testimony about his child abuse. And Whitton's sentencing court credited that testimony, as well as several other mitigating factors; Whitton was not limited to just "one" theory of mitigation, as Wiggins was. Given the several aggravators and grisly details of the murder, and the fact that the jury was already aware of Whitton's troubled childhood (albeit in less detail), this case differs from *Wiggins*.

And in *Rompilla*, the Court found that penalty-phase counsel was constitutionally deficient for failing to investigate the defendant's criminal history, on which the State intended to rely as an aggravator. *See* 545 U.S. at 390. It was "uncontested" that review of

the defendant's criminal record would have triggered "a range of mitigation leads that no other source had opened up," including information about "Rompilla's childhood and mental health" that differed "from anything defense counsel had seen or heard." *Id.* at 390. But here, and unlike in *Rompilla*, Tongue's penalty-phase evidence did not paint a "benign" picture of Whitton's "upbringing and mental capacity." *Id.* at 391. Nor did Tongue make only a "few naked pleas for mercy," *id.* at 393; he presented a mitigation case related to Whitton's upbringing. And he showed that Whitton had had a difficult childhood, complete with abuse and deprivation. *Rompilla* does not help Whitton here—if anything, it supports the State's position.

*Porter v. McCollum*, is even further afield. 558 U.S. 30 (2009) (per curiam). There, penalty-phase counsel "failed to uncover and present any evidence of [the defendant's] mental health or mental impairment, his family background, or his military service." *Id.* at 40. That deficient performance, the Court concluded, was prejudicial because the "judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability." *Id.* at 41; *cf. Ferrell v. Hall*, 640 F.3d 1199, 1236 (11th Cir. 2011) (finding prejudice where "the jury heard absolutely nothing about the substantial mitigating evidence"); *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541, 559 (11th Cir. 2015) (finding prejudice where "jury and the trial judge, however, heard none of" the "powerful mitigating evidence," which "enabled the prosecutor to emphasize repeatedly in closing arguments that there were no mitigating circumstances in Hardwick's

case"); *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1254 (11th Cir. 2016) (similar).

But here, Tongue did not fail to "present any evidence," *Porter*, 558 U.S. at 40, of Whitton's abusive childhood. And although additional mitigation evidence could have painted a more sympathetic picture, the sentencing court heard from multiple witnesses who attempted to "humanize," *id*. at 41, Whitton.

Most recently, in *Sears v. Upton*, the Court found both deficient performance and prejudice where "evidence relating to [the defendant's] cognitive impairments and childhood difficulties was not brought to light at the time he was sentenced to death." 561 U.S. 945, 946 (2010) (per curiam). Penalty-phase counsel "presented evidence describing [the defendant's] childhood as stable, loving, and essentially without incident," but the opposite was true. *Id*. at 947–48. Here, though, Tongue did no such thing. He portrayed Whitton's childhood as difficult.

The sentencing court explicitly afforded substantial weight to Whitton's background mitigation. And Whitton's postconviction evidence, while certainly compelling, told a "more detailed version of the same story told at trial," not an entirely new story. *Holsey v. Warden, Georgia Diagnostic Prison*, 694 F.3d 1230, 1261–64, 1266 (11th Cir. 2012) (finding no prejudice where "the basic story of his troubled, abusive childhood was nonetheless known to the sentencing court," even if postconviction counsel presented "more details" and "different examples" (cleaned up)); *Cullen v. Pinholster*, 563 U.S. 170, 200 (2011) (same, where the "'new' evidence,"

including school records and testimony from additional siblings as to child abuse, "largely duplicated the mitigation evidence at trial"); *Ferguson v. Comm'r, Ala. Dep't of Corr.*, 69 F.4th 1243, 1261 (11th Cir. 2023) ("While more mitigation witnesses could have presented more details or different examples of these unfortunate aspects of [the defendant's] life, these aspects were nonetheless known to the sentencing jury and judge."). Not only that, but we have "repeatedly held that even extensive mitigating evidence wouldn't have been reasonably likely to change the outcome of sentencing in light of a particularly heinous crime and significant aggravating factors." *Pye*, 50 F.4th at 1049 (collecting cases). And that was the case here.

To be sure, "counsel's effort to present some mitigation evidence" does not "foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant." *Sears*, 561 U.S. at 955. But a defendant is not prejudiced just because counsel could have presented more mitigation evidence. And although we may not have necessarily characterized the powerful and disturbing evidence uncovered in postconviction as "cumulative," the Florida Supreme Court's determination to that effect was not an unreasonable application of *Strickland*. *See* 28 U.S.C. § 2254(d)(1). As the district court found, Tongue "made his point," and the Sixth Amendment does not require him to have made it as persuasively or comprehensively as possible. *Cf. King v. Warden, Ga. Diagnostic Prison*, 69 F.4th 856, 875 (11th Cir. 2023) (explaining "counsel is not ineffective whenever more witnesses could have been called").

As to Whitton's claim that Dr. Larson was inadequate, Whitton conflates ineffective assistance of counsel with ineffective assistance of an *expert*. True, we have recognized the "particularly critical interrelation between expert psychiatric assistance and minimally effective representation of counsel." *United States v. Fessel*, 531 F.2d 1278, 1279 (5th Cir. 1979). But *Fessel* involved counsel's failure to obtain expert psychiatric testimony altogether, not an argument that the expert's report was not sufficiently comprehensive. And because evidence that Whitton had some mental defects was already before the jury, we cannot conclude that Tongue's failure to obtain a more comprehensive psychological evaluation was prejudicial. *Cf. Thornell v. Jones*, 602 U.S. 154, 166–71 (2024) (finding no prejudice where state court already received testimony that the defendant "suffers from a major mental illness" and has "cognitive impairment," even if not in the same level of detail, in light of the "weighty aggravating circumstances present"); *Sochor v. Sec'y Dep't of Corr.*, 685 F.3d 1016, 1031 (11th Cir. 2012) (same, where petitioner "fail[ed] to explain why the judge and jury would have been any more likely to accept such a theory when the underlying mental health issue" was one diagnosis as opposed to another).

In sum, we affirm the district court's conclusion that the Florida Supreme Court's application of *Strickland* was not unreasonable.

D. *Whitton cannot show any* Doyle *violations prejudiced the out-come of his trial.*

Finally, Whitton argues that three references to his invocation of his right to remain silent violated his *Doyle* rights and were not harmless. Those references occurred during (1) Officer Cotton's testimony, (2) Whitton's testimony, and (3) the prosecutor's closing argument.

First, Officer Cotton's testimony contained the following exchange:

> A: [. . .] And at 0515 a.m., he decided, once we were getting much closer to what we felt was the truth and we were tightening down on him being at the murder scene, he decided he did not want to talk to us anymore.
>
> Q: Did he tell you he went to the police at midnight on the 2nd (sic) and said, "Hey, I found a body in a room; my friend is dead."?
>
> A: No, sir, he did not.

Second, during Whiton's testimony, the prosecutor asked,

> Q: And what did you do when you told him, what did you do after that when you told him you didn't go back there?
>
> A: I told him --
>
> Q: You didn't say anymore, did you?

A: Excuse me?

Q: You didn't say anymore then, did you?

A: No, I did tell him after awhile that I did go back there.

Q: And when you told him that, then you didn't say nothing else.

A: No, sir.

Defense counsel did not object to either line of questioning.

And third, in his closing statement at trial, the prosecutor said the following:

> But in the last part of that interview, before the defendant says, "I'm not talking to you anymore," he tells him, "I went back over there, I walked in, and I saw my friend dead, and I left." Then he doesn't say anything else. He realizes at that point, "Uh-oh."

Defense counsel objected and moved for a mistrial based on those "improper comments" as to Whitton's invocation of his right to remain silent. The court denied the defense's motion for a mistrial but offered to give a curative instruction. Defense counsel declined so as not to "call[] attention to exactly what he's done" and "compound[] the problem." The court did, however, instruct the jury at the start of trial that it could not "draw any inference of guilt" from "the exercise of a defendant's right to remain silent."

On direct appeal, the Florida Supreme Court concluded that there was "no reasonable possibility that the improper comment[s] contributed to Whitton's conviction," especially given the "substantial amount of permissible evidence that conclusively proves Whitton's guilt." *Whitton I*, 649 So. 2d at 864–66. On federal habeas review, the district court held that this finding was not unreasonable given "the overall strength of the evidence as well as what Mr. Whitton said before invoking his right to remain silent."

Whitton argues that this conclusion was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). In response, the State contends, he has abandoned any challenge under § 2254(d)(1). Also, in the State's view, because defense counsel refused a curative instruction at trial, "law and justice do not permit [Whitton] to take advantage of his refusal in federal court decades later." But regardless of whether § 2254(d)(1) or (d)(2) is the operative provision, or whether the State's "law and justice" argument has merit, Whitton's challenge fails because he cannot prove prejudice.

To briefly recap the relevant law, a prosecutor cannot use a defendant's invocation of his right to remain silent to impeach his exculpatory testimony. *See Doyle v. Ohio*, 426 U.S. 610, 619 (1986). The *Doyle* rule "rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." *Wainwright v. Greenfield*, 474 U.S. 284, 291 (1986) (citation and internal quotation marks omitted). But *Doyle* errors are

subject to *Brecht*'s harmlessness inquiry.  *See, e.g.*, *Hill v. Turpin*, 135 F.3d 1411, 1416 (11th Cir. 1998).

On the one hand, "we have declined to find *Doyle* error harmless in those cases where the prosecutor returned repeatedly to the defendant's post-*Miranda* silence throughout trial to impeach a plausible exculpatory story offered by the defendant." *Id.* at 1417.

For example, in *Hill*, "on four separate occasions during [the defendant's] trial, the prosecution brought to the jury's attention Hill's post-*Miranda* silence and request for counsel," in violation of the court's order *in limine*. *Id.* at 1414. The court admonished the prosecutor and gave two curative instructions. *See id.* at 1415. But the prosecutor continued to reference the defendant's invocation of his *Miranda* rights, though his "remarks during closing argument [were] somewhat ambiguous." *See id.* at 1415 n.4. We held that the *Doyle* violations were not harmless given "the importance of Hill's credibility to his defense, the repeated and deliberate nature of the prosecution's *Doyle* violations, and the significant weaknesses in the state's case against Hill." *Id.* at 1416–17; *see also United States v. Tenorio*, 69 F.3d 1103, 1107 (11th Cir. 1995) (*Doyle* error not harmless where the defendant's "silence was the touchstone of the government's case-in-chief, its cross-examination of the defendant, and its closing argument" and "could reasonably have been the basis for the [jury's] guilty verdict").

On the other hand, "we have repeatedly held *Doyle* error harmless where the violation consisted of only a single reference to the defendant's post-*Miranda* silence during the course of a trial

at which the government's evidence was otherwise overwhelming." *Hill*, 135 F.3d at 1417 (first citing *United States v. Gabay*, 923 F.2d 1536, 1541 (11th Cir. 1991); then citing *United States v. Ruz–Salazar*, 764 F.2d 1433, 1437 (11th Cir. 1985); and then citing *Sullivan v. Alabama*, 666 F.2d 478, 485 (11th Cir. 1982)); *see also Prevatte v. French*, 547 F.3d 1300, 1305 (11th Cir. 2008) (finding *Doyle* error to be harmless where we were "overwhelmed by the evidence of [the defendant's] guilt, separate and apart from any evidence of his post-arrest silence"); *United States v. Miller*, 255 F.3d 1282, 1286 (11th Cir. 2001) (same, where improper questioning "took only moments of the trial" and "the government's evidence of guilt was strong"). That includes cases where the *Doyle* violation was "'isolated' or 'unintentional' or promptly addressed by a curative instruction from the trial court." *Hill*, 135 F.3d at 1417.

Whitton contends the *Doyle* violations here "were repeated throughout the trial, and were used to show both consciousness of guilt and to impeach Petitioner's plausible explanation for not initially wanting to admit he returned to the motel."

But we conclude this case is closer to *Brecht* itself, where the Supreme Court found the *Doyle* errors to be harmless because they "were infrequent, comprising less than two pages of the 900–page trial transcript," and "the State's evidence of guilt was, if not overwhelming, certainly weighty." 507 U.S. at 639.

Just as in *Brecht*, Whitton cites three comments throughout the entire trial, contrasted with the substantial evidence of his guilt: the blood spatter on his boots, the motel clerk's testimony, his own

admission that he returned to the motel (and originally lied about it to the police), and other circumstantial evidence. (That is, of course, ignoring Ozio and McCullough's testimony that Whitton confessed to the murder). Although the prosecutor's "Uh-oh" comment was certainly improper, it was five lines in 30 pages of closing argument. And defense counsel declined a curative instruction—a declination that was a deliberate, strategic decision to not call more attention to the matter. Given this case's resemblance to *Brecht*, we conclude that Whitton cannot meet his burden to show that the Florida Supreme Court's harmless-error conclusion was based on an unreasonable determination of the facts or the law. *See* 28 U.S.C. § 2254(d)(1)–(2). We thus affirm the district court's denial of relief on Whitton's *Doyle* claim.

## IV. CONCLUSION

Accordingly, we affirm the district court's denial of Davis's federal habeas petition.

**AFFIRMED.**